313 Ga. 533
FINAL COPY

S21G0555. MAYNARD et al. v. SNAPCHAT, INC.

COLVIN, Justice.

While driving over 100 miles per hour, Christal McGee rear-ended a car driven by Wentworth Maynard, causing him to suffer severe injuries. When the collision occurred, McGee was using a "Speed Filter" feature within Snapchat, a mobile phone application, to record her real-life speed on a photo or video that she could then share with other Snapchat users. Wentworth and his wife, Karen Maynard, sued McGee and Snapchat, Inc. ("Snap"),[1] alleging that Snap had negligently designed Snapchat's Speed Filter. The trial court dismissed the design-defect claim against Snap, and a divided panel of the Court of Appeals affirmed, holding that Snap did not owe a legal duty to the Maynards because a manufacturer's duty to design reasonably safe products does not extend to people injured by a third party's intentional and tortious misuse of the manufacturer's

_____

[1] The record indicates that Snapchat, Inc. is now known as Snap Inc.

product.  See *Maynard v. Snapchat, Inc.*, 357 Ga. App. 496, 500, 502 (851 SE2d 128) (2020).

On certiorari, we conclude that the Court of Appeals erred.  For the reasons discussed below, a manufacturer has a duty under our decisional law to use reasonable care in selecting from alternative designs to reduce reasonably foreseeable risks of harm posed by its products.  When a particular risk of harm from a product is not reasonably foreseeable, a manufacturer owes no design duty to reduce that risk.  How a product was being used (e.g., intentionally, negligently, properly, improperly, or not at all) and who was using it (the plaintiff or a third party) when an injury occurred are relevant considerations in determining whether a manufacturer could reasonably foresee a particular risk of harm from its product.  Nevertheless, our decisional law does not recognize a blanket exception to a manufacturer's design duty in all cases of intentional or tortious third-party use.  Because the holding of the Court of Appeals conflicts with these principles, and because the Maynards adequately alleged that Snap could reasonably foresee the

2

particular risk of harm from the Speed Filter at issue here, we reverse the judgment of the Court of Appeals and remand for further proceedings.

1. In their second amended complaint, the Maynards alleged that, around 10:15 p.m. on September 10, 2015, McGee crashed her car into the back of Wentworth's vehicle while driving 107 miles per hour. According to the Maynards, McGee told her three passengers right before the crash that she was "just trying to get the car to 100 m.p.h. to post it on Snapchat" using Snapchat's Speed Filter.

The Maynards asserted a negligence claim and a derivative loss-of-consortium claim against McGee and Snap, seeking damages, punitive damages, and litigation expenses. In relevant part, the Maynards alleged that Snap had negligently designed the Speed Filter feature of the Snapchat application. Specifically, they alleged that Snap "owed a duty to use ordinary care in designing . . . its products, including but not limited to Snapchat's Speed Filter." "Snap[ ] breached that duty," the Maynards alleged, because (1) Snap "did not remove, abolish, restrict access to, or otherwise use

3

reasonable care to address the danger created by Snapchat's Speed Filter and other products," (2) Snap's "design decisions regarding its Speed Filter and other products [were] unreasonable and negligent," and (3) Snap's "disclaimers [and warnings were] also inadequate, unreasonable, and knowingly ineffective." The Maynards further alleged that Snap had designed its products to "encourage" dangerous behaviors and could "reasonably foresee[ ]" that the "Speed Filter was motivating, incentivizing, or otherwise encouraging its users to drive at excessive, dangerous speeds in violation of traffic and safety laws." Finally, the Maynards alleged that Wentworth was injured "[a]s a result of [Snap's] negligence," which was "concurrent with McGee's negligence."

Snap answered the complaint, attaching copies of its Terms of Use and a "pop-up warning" that, according to Snap, "a user first accessing the Snapchat 'speed filter' would see." The Terms of Use stated that the user agreed not to use Snapchat "for any illegal or unauthorized purpose," and the warning stated, "Please, DO NOT Snap and drive." Snap then moved to dismiss the Maynards' second

4

amended complaint for failure to state a claim or, in the alternative, for judgment on the pleadings.

The trial court granted Snap's motion, dismissing the Maynards' claims without leave to amend for two reasons. First, the court concluded that Snap owed no legal duty to the Maynards because Snap did not owe a duty as a manufacturer to design its product to prevent McGee from driving dangerously or to control McGee's conduct. Second, the court concluded that the Maynards could not establish proximate causation because (a) a driver's inattention, not a mobile phone application, causes a driver to wreck a car, and (b) McGee's criminal and negligent driving, as reflected in her May 17, 2018 plea of no contest to serious injury by vehicle, constituted a superseding and intervening cause that broke the causal chain. The trial court also granted Snap's motion for judgment on the pleadings, concluding that McGee's violation of Snap's Terms of Use and disregard for Snap's pop-up warning broke the causal chain.

The Court of Appeals granted the Maynards' application for an

5

interlocutory appeal, and a divided panel affirmed the trial court's determination that Snap did not owe a legal duty to the Maynards. See *Maynard*, 357 Ga. App. at 498, 502.[2] We granted certiorari to determine whether the Court of Appeals erred in affirming the dismissal of the Maynards' second amended complaint.

2. We review de novo a trial court's ruling on a motion to dismiss, "accepting as true all well-pled material allegations in the complaint and resolving any doubts in favor of the plaintiff." *Williams v. DeKalb County*, 308 Ga. 265, 270 (2) (840 SE2d 423) (2020) (punctuation omitted). "The existence of a legal duty," which can arise by statute or be imposed by decisional law, "is a question of law for the court." *Rasnick v. Krishna Hospitality*, 289 Ga. 565, 566-567 (713 SE2d 835) (2011).

Because Georgia's product-liability law is a creature of both statute and decisional law, there is more than one source for the duties that manufacturers owe with respect to the design of their

---

[2] The Court of Appeals did not address the trial court's alternative grounds for dismissal and judgment on the pleadings.

products. By statute, Georgia "imposes strict liability [on manufacturers] for defective products." *Banks v. ICI Americas*, 264 Ga. 732, 733 (1) (450 SE2d 671) (1994); see also *Johns v. Suzuki Motor of America*, 310 Ga. 159, 163 (3) (850 SE2d 59) (2020) ("[S]trict products liability imposes liability irrespective of negligence." (citation and punctuation omitted)). Georgia's strict-product-liability statute provides:

> The manufacturer of any personal property sold as new property directly or through a dealer or any other person shall be liable in tort, irrespective of privity, to any natural person who may use, consume, or reasonably be affected by the property and who suffers injury to his person or property because the property when sold by the manufacturer was not merchantable and reasonably suited to the use intended, and its condition when sold is the proximate cause of the injury sustained.

OCGA § 51-1-11 (b) (1). As we have explained, the phrase "not merchantable and reasonably suited to the use intended," as used in this statute, means that "the manufacturer's product when sold by the manufacturer was defective." *Center Chem. Co. v. Parzini*, 234 Ga. 868, 869 (2) (218 SE2d 580) (1975). There are several ways in which a product can be "defective," including by being defectively

designed. See *Banks*, 264 Ga. at 733 (1) ("There are three general categories of product defects: manufacturing defects, design defects, and marketing/packaging defects."). Accordingly, under Georgia's product-liability statute, a manufacturer who sells a product has a duty to ensure that the product it sells does not have a design defect. See id.; see also OCGA § 51-1-11 (b) (1).

Similarly, under our decisional law, when designing a product, a manufacturer has a duty to exercise reasonable care in "selecting from among alternative product designs" to "reduce[ ] the [reasonably] foreseeable risks of harm presented by [a] product." *Jones v. NordicTrack, Inc.*, 274 Ga. 115, 118 (550 SE2d 101) (2001). Indeed, it has been a longstanding principle of our case law regarding allegedly defective product designs that a designer's duty extends only to reasonably foreseeable risks of harm. See *Richmond & Danville R. Co. v. Dickey*, 90 Ga. 491, 492-493 (2) (16 SE 212) (1892) (holding that a railroad company was "not required by law" to exercise the "degree of diligence" necessary to reduce the risk of injury from "a defect in [a flat-car] brake," which allegedly had an

8

"unnecessarily long" bolt, because "no other servant of this company ha[d] ever before been injured as the plaintiff was, and there was no reason whatever for apprehending that such an injury was in the least likely to occur").[3]

---

[3] In this regard, the duty owed by a manufacturer charged with negligent design is similar in scope to the duty owed by defendants charged with many other types of negligent conduct, which is likewise generally limited to reasonably foreseeable risks of harm. See, e.g., *Martin v. Six Flags Over Georgia II, L.P.*, 301 Ga. 323, 328 (II) (801 SE2d 24) (2017) (A landowner's duty to protect invitees from third-party criminal attacks "extends *only* to *foreseeable* criminal acts." (citation and punctuation omitted; emphasis in original)); *Steagald v. Eason*, 300 Ga. 717, 717, 719-720 (797 SE2d 838) (2017) (There is no duty to restrain a vicious or dangerous dog under OCGA § 51-2-7 unless "the owner or keeper has *reason to know* of the dog's propensity to do harm of the type which it inflicts," meaning that the owner or keeper knows of "at least one incident that would cause a prudent person to *anticipate* the actual incident that caused the injury." (citations and punctuation omitted; emphasis supplied)); *Thurman v. Applebrook Country Dayschool*, 278 Ga. 784, 785 (1) (604 SE2d 832) (2004) ("[A] person who undertakes the control and supervision of a child . . . has [a] duty to use reasonable care to protect the child from . . . *reasonably foreseeable risk of harm*." (citation and punctuation omitted; emphasis in original)); *Munroe v. Universal Health Svcs.*, 277 Ga. 861, 863 (1) (596 SE2d 604) (2004) ("[A] defendant employer has a duty to exercise ordinary care not to hire or retain an employee the employer *knew or should have known* posed a risk of harm to others where it is *reasonably foreseeable* from the employee's 'tendencies' or propensities that the employee could cause the type of harm sustained by the plaintiff." (emphasis supplied)); *Southeastern Stages v. Stringer*, 263 Ga. 641, 643 (437 SE2d 315) (1993) ("[A] common carrier is not required to take measures to protect its passengers from the intentional misconduct of third persons until something occurs to put the carrier on notice that such conduct might be *reasonably anticipated*. To establish *reasonable foreseeability*, more than the mere possibility of an occurrence must be shown[.]" (citation omitted; emphasis

Because a manufacturer may owe a design duty under Georgia's product-liability statute or under this State's decisional law, a plaintiff injured by a defectively designed product can pursue a claim against a manufacturer under either a statutory strict-liability theory or a decisional-law negligence theory or both. See *Jones*, 274 Ga. at 117 (noting that defective-design claims can be brought based on negligence or strict liability). Here, the Maynards pursued only a negligence theory of design defect against Snap.

When a plaintiff alleges that a manufacturer defectively designed a product, the same test is used to assess breach of the manufacturer's design duty — that is, "whether a product was defective" for purposes of a strict-liability claim or "whether the manufacturer's conduct was reasonable" for purposes of a negligence claim. *Banks*, 264 Ga. at 735 (1) n.3. Under either theory of

---

supplied)); *Gregory v. Johnson*, 249 Ga. 151, 151, 155 (289 SE2d 232) (1982) (A landowner has a duty only "to exercise reasonable care to prevent *foreseeable* injury" from an "attractive nuisance" on the premises. (emphasis in original)); *Ellington v. Tolar Constr. Co.*, 237 Ga. 235, 238 (III) (227 SE2d 336) (1976) ("Negligence consists of exposing another to whom one owes a duty . . . to a *foreseeable* unreasonable probability of harm." (emphasis supplied)).

recovery, the factfinder performs a "risk-utility analysis," assessing "the reasonableness of choosing from among various alternative product designs" by asking whether "the risk of harm outweighs the utility of a particular design" to determine whether "the product is not as safe as it should be." Id. at 734-736 (1) & n.3 (punctuation omitted).[4] Because "negligence principles" underlying the risk-

---

[4] Although this Court has said that the risk-utility test requires a fact-intensive inquiry for which "no finite set of factors can be considered comprehensive or applicable under every factual circumstance," we have identified "a non-exhaustive list of general factors" that might be relevant in design-defect cases. *Banks*, 264 Ga. at 736 (1). These factors include:

> the usefulness of the product; the gravity and severity of the danger posed by the design; the likelihood of that danger; the avoidability of the danger, i.e., the user's knowledge of the product, publicity surrounding the danger, or the efficacy of warnings, as well as common knowledge and the expectation of danger; the user's ability to avoid danger; the state of the art at the time the product is manufactured; the ability to eliminate danger without impairing the usefulness of the product or making it too expensive; . . . the feasibility of spreading the loss in the setting of the product's price or by purchasing insurance[;] . . . the feasibility of an alternative design; the availability of an effective substitute for the product which meets the same need but is safer; the financial cost of the improved design; . . . the adverse effects from the alternative[;] . . . the appearance and aesthetic attractiveness of the product; its utility for multiple uses; the convenience and extent of its use . . . ; and the collateral safety of a feature other than the one that harmed the plaintiff.

Id. at 736 (1) n.6.

utility analysis are used to determine breach of a manufacturer's statutory and decisional-law duties in many design-defect cases, we have noted that there is often significant "overlap" between strict-liability and decisional-law negligence claims premised on design defects. Id. at 735 (1) n.3; but see id. (noting that we have never "conclude[d] definitively that [strict-liability and negligence] theories merge in design defect cases").

In addition to proving that a product was defectively designed, a plaintiff seeking to hold a manufacturer liable for a design defect must show that the defect proximately caused the plaintiff's injury. See *Jones*, 274 Ga. at 117 ("[A] manufacturer [can] be held liable in negligence or strict liability for injuries proximately caused by [a defectively designed] product."); OCGA § 51-1-11 (b) (1) (providing that a product defect must be "the proximate cause of the injury sustained"). "Proximate cause is that which, in the natural and continuous sequence, unbroken by other causes, produces an event, and without which the event would not have occurred." *Johnson v. Avis Rent A Car System*, 311 Ga. 588, 592 (858 SE2d 23) (2021)

(citation and punctuation omitted).

A breach of a duty constitutes a proximate cause of an injury only if the injury is the "probable" result of the breach, "according to ordinary and usual experience," as opposed to "merely [a] possible" result of a breach, "according to occasional experience." *Johnson*, 311 Ga. at 592 (citation and punctuation omitted). We have explained that

> [i]t is important to recognize that "probable," in the rule as to causation, does not mean "more likely than not" but rather "not unlikely"; or, more definitely, "such a chance of harm as would induce a prudent man not to run the risk; such a chance of harmful result that a prudent man would foresee an appreciable risk that some harm would happen."

Id. (citation and punctuation omitted); see, e.g., *Blakely v. Johnson*, 220 Ga. 572, 576-577 (140 SE2d 857) (1965) (holding that making loud noises at a service station to attract the attention of potential customers was not a proximate cause of a motorist collision because "the probable consequence of [the employees'] acts" was not "that a passing motorist would negligently disregard his own safety because of their advertising acts, and that such motorist would violate traffic

13

laws and cause injuries to third persons").

Further, under "the well-established doctrine of intervening causes," a defendant's breach of a duty does not constitute a "proximate cause" of a plaintiff's injury when

> there has intervened between the act of the defendant and the injury to the plaintiff, an independent act or omission of someone other than the defendant, which was not *foreseeable* by [the] defendant, was not triggered by [the] defendant's act, and which was sufficient of itself to cause the injury.

*City of Richmond Hill v. Maia*, 301 Ga. 257, 259 (1) (800 SE2d 573) (2017) (citation and punctuation omitted; emphasis in original); see also *Jordan v. Everson*, 302 Ga. 364, 365-366 (806 SE2d 533) (2017) (holding that a third party's intervening and independent act need not be "wrongful or negligent" to break the causal chain); *Goldstein, Garber & Salama, LLC v. J. B.*, 300 Ga. 840, 841 (1) (797 SE2d 87) (2017) ("[T]his [intervening-cause] rule does not insulate the defendant if the defendant had reasonable grounds for apprehending that such [an] act [of a third party] would be committed." (citation and punctuation omitted)).

14

As shown by the above discussion, considerations regarding foreseeability are intertwined with questions of duty, breach, and proximate causation in negligent-design cases. When determining whether a manufacturer owes a decisional-law design duty with respect to a particular risk of harm posed by a product, the question is whether that particular risk was reasonably foreseeable. See *Jones*, 274 Ga. at 118. Whether a manufacturer breached its design duty turns on whether it "failed to adopt a reasonable, safer design that would have reduced the foreseeable risks of harm presented by the product." *Banks*, 264 Ga. at 736 (1) n.4 (citation and punctuation omitted). Finally, the proximate-cause inquiry asks whether "a prudent [manufacturer] would foresee an appreciable risk that," as a result of an unreasonable design decision, "some harm would happen" "according to ordinary and usual experience." *Johnson*, 311 Ga. at 592 (citation and punctuation omitted).

3. As noted in Division 2 above, only reasonably foreseeable risks of harm posed by a product trigger a manufacturer's duty to use reasonable care in selecting from alternative designs under our

decisional law.  See *Jones*, 274 Ga. at 118.  Applying that standard, the Maynards adequately alleged at the motion-to-dismiss stage that Snap owed Wentworth a design duty with respect to the particular risk of harm at issue here — namely, injury to a driver resulting from another person's use of the Speed Filter while driving at excess speed.

Specifically, the Maynards alleged that Snap could reasonably foresee that its product design created this risk of harm based on, among other things, the fact that Snap knew that other drivers were using the Speed Filter while speeding at 100 miles per hour or more as part of "a game," purposefully designed its products to encourage such behavior, knew of at least one other instance in which a driver who was using Snapchat while speeding caused a car crash, and warned users not to use the product while driving.  The Maynards further alleged that, "[o]nce downloaded, Snapchat's software continues to download and install upgrades, updates, or other new features" from Snap, meaning that the Maynards may be able to introduce evidence showing that Snap continued developing its

16

product and released new versions of the software between the initial launch of the Speed Filter and the date of Wentworth's accident, after obtaining real-world information about how the Speed Filter was in fact being used. Given these allegations, we cannot say as a matter of law at the motion-to-dismiss stage that the Maynards could not introduce evidence that, when designing the Speed Filter, Snap could reasonably foresee that the product's design created a risk of car accidents like the one at issue here, triggering a duty for Snap to use reasonable care in designing the product in light of that risk. See *Collins v. Athens Orthopedic Clinic*, 307 Ga. 555, 560 (2) (a) (837 SE2d 310) (2019) (noting that a motion to dismiss for failure to state a claim cannot be granted unless "the plaintiff would not be entitled to relief under any state of provable facts asserted in support of the allegations in the complaint and could not possibly introduce evidence within the framework of the complaint sufficient to warrant a grant of the relief sought" (citation and punctuation omitted)); see also *Lemmon v. Snap, Inc.*, Case No. CV 19-4504-MWF (KSx), 2019 WL 7882079, at *7 (C.D. Cal. Oct. 30,

17

2019) (holding that plaintiffs asserting a car-crash-related wrongful-death claim against Snap "sufficiently alleged a duty" owed by Snap because the plaintiffs' allegation that "[car] accidents ha[d] occurred as a result of users attempting to capture [a 100 m.p.h.] Snap" as part of a "game" prevented the court from "determin[ing] that the harm from the Speed Filter was not foreseeable as a matter of law"). Cf. *Sturbridge Partners v. Walker*, 267 Ga. 785, 787 (482 SE2d 339) (1997) ("[E]vidence of the prior burglaries was sufficient to give rise to a triable issue as to whether or not Sturbridge had the duty to exercise ordinary care to safeguard its tenants against the foreseeable risks posed by the prior burglaries.").[5]

4. The Court of Appeals majority opinion acknowledged the general framework for alleging and assessing negligent-design claims under our decisional law, which we set out in Division 2 above. Specifically, the majority noted that "manufacturers have a

---

[5] We take no position as to whether summary judgment might be granted on this point or on other elements of the Maynards' claim, after the parties have presented evidence regarding the foreseeability of risks posed by the product and other issues.

duty to exercise reasonable care in manufacturing their products so as to make products that are reasonably safe for intended or foreseeable uses," and that "the risk-utility balancing test . . . [is] the test for negligence [i.e., breach] in a design defect case such as this one." *Maynard*, 357 Ga. App. at 499-500 (citations and punctuation omitted). Nevertheless, the majority concluded that a manufacturer's duty to use reasonable care to design reasonably safe products "does not extend to the intentional (not accidental) misuse of the product in a tortious way by a third party." Id. at 500. The majority did not cite any authority directly supporting this legal proposition, and the dissenting opinion asserted that the majority had "creat[ed] new law" in conflict with well-established principles of product-liability law. Id. at 504 (McFadden, C. J., dissenting). We agree with the dissent that established principles of Georgia law do not support the majority's holding with respect to decisional-law negligent-design claims. Indeed, our decisional law provides no basis for concluding that (1) intentional misuse, (2) third-party use of a product, or (3) third-party tortious use of a product *necessarily*

19

negates a manufacturer's duty to use reasonable care to reduce reasonably foreseeable risks from its products. Rather, as described in Division 2 above, a manufacturer's design duty for purposes of a negligent-design claim extends to all reasonably foreseeable risks posed by a product.

(a) First, there is no blanket intentional-misuse exception to a manufacturer's design duty under Georgia decisional law. The Court of Appeals majority relied on our decision in *Jones* to conclude that, although an *accidental misuse* of a product could result in manufacturer liability, an *intentional misuse* of a product could not. See *Maynard*, 357 Ga. App. at 500 & n.11 (citing *Jones*, 274 Ga. at 118 for support by comparison). But *Jones* actually contradicts this proposition, as that decision clarified that a manufacturer may have a design duty to reduce foreseeable risks from a product regardless of how the product was being used or whether it was being used at all.

In *Jones*, a plaintiff who was injured "when she fell against [a] ski exerciser" that was not in use at the time filed design-defect

20

claims against the manufacturer in federal court based on strict liability, negligence, and failure to warn. *Jones*, 274 Ga. at 116. The federal district court concluded that Georgia design-defect claims cannot "arise [absent] some use of the product" and granted the defendant's motion for judgment on the pleadings. Id. The United States Court of Appeals for the Eleventh Circuit then certified a question to this Court, asking whether a product needed to be "in use at the time of injury for a [manufacturer] to be held liable for defective design." Id. at 115. We answered the question in the negative, holding that "use" was not "a predicate to liability." Id. at 117-118. Because "the focus [of a design-defect claim] remains on the foreseeability of the risk of harm or the danger involved," we explained, it was "wholly unnecessary" to engage in the difficult task of "characteriz[ing]" or "defining" the "type of use" of a product as, for example, "in use," "misuse, unintended use, or abnormal use." Id. at 117-118 & n.9 (punctuation omitted). "The 'heart' of a design defect case," we said, was instead whether a manufacturer had breached its duty to "reduce[ ] the foreseeable risks of harm

21

presented by [a] product" by "fail[ing] to adopt a reasonable alternative design." Id. at 118.

Under *Jones*, then, regardless of how a product was being used when an injury occurred — whether it was being used properly, improperly, intentionally, negligently, or not at all — a manufacturer may owe a design duty to an injured person. See id. at 117-118. As explained above in Division 2, a manufacturer has a statutory duty to ensure that products it sells are not defectively designed, see OCGA § 51-1-11 (b) (1), and a duty under our decisional law to use reasonable care to reduce foreseeable risks of harm from a product when selecting from alternative designs, see *Jones*, 274 Ga. at 117-118. Thus, Georgia law does not recognize a blanket exception to a manufacturer's design duty in all cases of intentional misuse. See *Jones*, 274 Ga. at 117-118; *Crosby v. Cooper Tire & Rubber Co.*, 240 Ga. App. 857, 861 (3) (b) (524 SE2d 313) (1999) ("Product misuse d[oes] not relieve the manufacturer from liability for a defective product when such misuse was known by the manufacturer or was reasonably foreseeable by the manufacturer,

22

as alleged in this case."), rev'd in part on other grounds, *Cooper Tire & Rubber Co. v. Crosby*, 273 Ga. 454 (543 SE2d 21) (2001); *Ford Motor Co. v. Stubblefield*, 171 Ga. App. 331, 335-336 (2) (319 SE2d 470) (1984) (rejecting an argument that product "misuse" relieved an automobile manufacturer of its "legal duty" to reduce a foreseeable risk of injury from "a defect which causes injury when activated by a foreseeable collision").

(b) Second, the Court of Appeals majority erred to the extent that it concluded that a manufacturer cannot ever owe a design duty to an injured person if the person was injured by a *third party's* use of its product. See *Maynard*, 357 Ga. App. at 499-500 (highlighting that the Maynards' claim was "predicated on McGee's conduct"). Under Georgia law, a manufacturer may owe a design duty to an injured person regardless of who — the injured person or a third party — was using the defectively designed product when the injury occurred. "The plain language of the [strict-product-liability] statute extends manufacturer liability not only to those who may use the property, but also to those persons who may 'consume' the

property or 'reasonably be affected' by it." *Jones*, 274 Ga. at 117. Similarly, under our decisional law regarding negligent design, a manufacturer may be liable for a plaintiff's injury whether the injury was caused by the plaintiff's use or by a third party's use of a defectively designed product. See, e.g., *CertainTeed Corp. v. Fletcher*, 300 Ga. 327, 328-329 (1) (794 SE2d 641) (2016) (concluding that, where a plaintiff was injured by laundering the clothing of a third party who had worked with a manufacturer's asbestos-laden water pipes, the manufacturer's design duty under Georgia decisional law extended to the plaintiff); *Ogletree v. Navistar Intl. Transp. Corp.*, 271 Ga. 644, 644-645 (522 SE2d 467) (1999) (reversing a trial court's grant of judgment notwithstanding the verdict to a defendant manufacturer after a jury found the manufacturer liable for negligently designing a fertilizer spreader truck without a back-up alarm that killed the plaintiff's husband while being driven by a third party); *Ford Motor Co.*, 171 Ga. App. at 335-336 (2) ("[A]n automobile manufacturer may be held liable for negligently producing a vehicle with a defect which causes injury

24

when activated by a foreseeable collision [caused by a third party].").

The rationale offered by the Court of Appeals majority for concluding that a manufacturer could never be held liable for a third party's use of a defectively designed product is unpersuasive. The majority concluded that, even if Snap owed a duty to design a reasonably safe product, that duty did not extend to people injured by a third party's use of the product because Georgia does not recognize a general duty to the whole world or a general duty to control a third person's conduct. See *Maynard*, 357 Ga. App. at 499-500. The majority further concluded that the Maynards sought to "impos[e] a duty on Snap[ ] to control or avoid McGee's allegedly tortious conduct" because the Maynards alleged that Snapchat's design encouraged misuse. Id. This reasoning, however, relied upon general negligence principles inapplicable to the Maynards' product-liability claim and misconstrued the Maynards' allegations.

It is true that Georgia decisional law ordinarily does not recognize a "general legal duty to all the world not to subject others to an unreasonable risk of harm," *Dept. of Labor v. McConnell*, 305

25

Ga. 812, 816 (3) (a) (828 SE2d 352) (2019) (citation and punctuation omitted), or a general "duty to control the conduct of third persons to prevent them from causing physical harm to others," *Bradley Center, Inc. v. Wessner*, 250 Ga. 199, 201 (1) (296 SE2d 693) (1982) (lead opinion), disapproved of on other grounds by *McConnell*, 305 Ga. at 815-816 (3) (a); see also *Stanley v. Garrett*, 356 Ga. App. 706, 710 (1) (848 SE2d 890) (2020). But the Maynards did not allege that Snap breached a general duty to the whole world. Rather, the Maynards alleged that Snap owed a duty under our decisional law "to use ordinary care in designing . . . its products" to reduce reasonably foreseeable "danger created by Snapchat's Speed Filter."

Nor did the Maynards' allegations regarding "encouragement" purport to impose a new type of duty on Snap as a manufacturer to "control" users' conduct. The Maynards alleged that Snap had "purposefully designed its product to encourage" dangerous use of the product rather than "address[ing] the danger created by [its] Speed Filter," and that Snap could "reasonably foresee[ ]" that the "Speed Filter was motivating, incentivizing, or otherwise

26

encouraging its users to drive at excessive, dangerous speeds in violation of traffic and safety laws," given what it knew about how users were in fact using the application. These allegations simply supported the Maynards' claim that (1) the particular risk of harm was reasonably foreseeable, triggering Snap's design duty, (2) Snap breached its design duty under the risk-utility analysis, and (3) Snap's breach proximately caused Wentworth's injuries. See *Jones*, 274 Ga. at 118 (noting that a design duty extends to "foreseeable risks"); *Banks*, 264 Ga. at 736 (1) n.6 (noting that the likelihood of the danger is a factor relevant to the risk-utility analysis, which is an analysis of breach); see also *Johnson*, 311 Ga. at 592 (noting that proximate causation turns on whether the consequence of a breach is a foreseeable result "according to ordinary and usual experience" (punctuation omitted)). We discern no allegation that Snap had a duty to "control" McGee's conduct.[6]

---

[6] Accordingly, we need not address the Court of Appeals majority's conclusion that public policy considerations do not favor imposing a new duty upon manufacturers to "control" the conduct of product users. See *Maynard*, 357 Ga. App. at 500-502.

In short, the Maynards asserted a conventional design-defect claim based on the ordinary design duty recognized under our decisional law, a breach of that duty, and an injury proximately caused by the breach. See *Jones*, 274 Ga. at 118 (addressing the duty element of a decisional-law design-defect claim); *Banks*, 264 Ga. at 734-735 (1) (discussing breach of a design duty under the risk-utility analysis); *Ontario Sewing Machine Co. v. Smith*, 275 Ga. 683, 687 (572 SE2d 533) (2002) (discussing the proximate-cause element of a design-defect claim); *Maynard*, 357 Ga. App. at 503 (McFadden, C. J., dissenting) (noting that the Maynards' allegations "set out a substantively conventional design-defect claim").

(c) Third, although it did not cite any supporting authority, the Court of Appeals majority appeared to conclude that a manufacturer can never have a duty to use reasonable care in designing its products if a third party used a product intentionally and tortiously. See *Maynard*, 357 Ga. App. at 500. There is no support for this proposition in our decisional law, which appears to have never squarely addressed the issue. To the extent that our precedent has

28

any bearing on this issue, however, it suggests the opposite — that a manufacturer may have a design duty, even when an injury is caused by third-party tortious use of a product. See *Pearson v. Tippmann Pneumatics*, 281 Ga. 740, 740-741, 744 (3) (642 SE2d 691) (2007) (holding in the context of a proximate-cause analysis that both a third party, who tortiously fired a paintball gun at the plaintiff's eye while mistakenly believing the safety mechanism was engaged, and the paintball-gun manufacturer, who allegedly designed the safety mechanism with a defective "safe" indicator, could be liable for the resulting injury).

(d) Contrary to the opinion of the Court of Appeals majority, our decisional law does not recognize a blanket exception to a manufacturer's design duty in all cases of intentional or tortious third-party product misuse. Nevertheless, we emphasize that intentional or tortious third-party misuse may be an important consideration in determining whether a manufacturer owes a decisional-law design duty in a particular case, whether the manufacturer breached that duty, and whether the manufacturer's

29

breach was a proximate cause of the resulting injury.  As in other areas of the law where a defendant's duty extends only to reasonably foreseeable risks, the likelihood and nature of a third party's use of a product may be relevant in determining whether the particular risk of harm from a product was reasonably foreseeable, and thus whether a manufacturer owed a decisional-law design duty to avoid that risk in a particular case.  Cf. *Doe v. Prudential-Bache/A.G. Spanos Realty Partners*, 268 Ga. 604, 605-606 (492 SE2d 865) (1997) (concluding that, although "questions of foreseeability" underlying a landlord's "duty to protect tenants from the [foreseeable] criminal attacks of third parties" are "generally for a jury," the evidence of foreseeability on summary judgment could not support a finding that the landlord owed a duty to the victim of a criminal attack). Third-party product use may also be relevant in determining whether a manufacturer breached its design duty if, for example, danger from such use was so unlikely as to render reasonable a manufacturer's decision not to address it.  See *Banks*, 264 Ga. at 736 (1) n.6 (noting that a relevant factor in the risk-utility analysis is

30

the likelihood of a danger). Finally, the likelihood and nature of a third party's tortious product use may be relevant in determining whether a manufacturer's breach can be considered a proximate cause of the injury or whether, under the doctrine of intervening causes, the third party's conduct should be deemed the sole proximate cause of the injury. See *Johnson*, 311 Ga. at 593.

5. Snap and its amici curiae argue that, to the extent that our decisional law does not recognize an exception to a manufacturer's design duty in every case of intentional, tortious product misuse, Georgia law would be an outlier among American jurisdictions, imposing a significantly greater scope of liability on manufacturers for design defects. We acknowledge that some jurisdictions have held that manufacturers do not owe a design duty in specific cases of intentional, tortious product misuse. Nevertheless, the cases on which Snap and its amici curiae rely do not demonstrate that manufacturers face significantly greater risk of liability under Georgia decisional law than under the law of other jurisdictions. This is so because the legal principles underlying the duty, breach,

31

and proximate-cause elements of a negligent-design claim set out in Division 2 above collectively address the significant considerations other jurisdictions have relied upon in concluding that manufacturers owe no design duty in particular cases of intentional, tortious product misuse. In other words, Snap and its amici curiae have not shown that the design-defect claims involving intentional, tortious product misuse that other jurisdictions rejected for lack of duty would fare markedly better under Georgia law.

The primary case on which Snap and its amici curiae rely, *Modisette v. Apple Inc.*, 30 Cal. App. 5th 136 (241 Cal. Rptr. 3d 209) (2018), illustrates this point well. There, the California Court of Appeals primarily relied on a proximate-cause analysis to conclude at the motion-to-dismiss stage that, for purposes of a California negligent-design claim, Apple did not have a duty as a cell-phone manufacturer to design a phone "in such a manner that a user is incapable of using it while driving." Id. at 151-152 (II) (B). Specifically, the court concluded that there was not a close connection between Apple's design choices and the injury suffered

32

because "[i]t was [the driver's] conduct of utilizing FaceTime while driving at highway speed that directly placed the [plaintiffs] in danger," "[n]othing that Apple did induced [the driver's] reckless driving," and the court was not "willing to make a baseline assumption that iPhone owners will ordinarily use their phones in a dangerous manner while driving." Id. at 147-148 (II) (B) (citation and punctuation omitted).[7]

Although *Modisette* characterized this reasoning as an aspect of its "duty" analysis when addressing the plaintiffs' negligent-design claim, the court used the same reasoning to reject the plaintiffs' materially identical California strict-liability design-defect claim for lack of proximate causation. Unlike the negligent-design claim, the court explained, the plaintiffs' "claims against

---

[7] Notably, unlike *Modisette*, where there was no allegation that Apple had induced reckless driving or that drivers ordinarily engaged in dangerous phone use while driving, the Maynards alleged here that Snap "knew or should have known that its Speed Filter was motivating, incentivizing, or otherwise encouraging its users to drive at excessive, dangerous speeds in violation of traffic and safety laws," that "many of its users" were using the Speed Filter as part of "a game" to capture photos of them driving 100 miles per hour, and that Snap had in fact "purposefully designed its products to encourage such behavior[ ]."

Apple for strict products liability . . . d[id] not require a showing that Apple owed the [plaintiffs] a duty of care" because a duty was imposed by California decisional law. Id. at 152 (II) (C). Nevertheless, following the same "duty" analysis it had conducted with respect to the negligence claim, the court concluded that the strict-liability claim failed for lack of proximate causation. See id. at 153-154 (II) (C). Specifically, the court held that designing the cell phone without lock-out technology did not proximately cause the plaintiffs' injuries because it was the driver who had "caused the [plaintiffs'] injuries when he crashed into their car while he willingly diverted his attention from the highway," and the product design "did nothing more than create the condition that made Plaintiffs' injuries possible." Id. Thus, even Snap's best example of a case holding that a manufacturer did not have a design duty in a specific case of intentional misuse demonstrates that failing to recognize a per se duty exception in such cases does not necessarily expose a manufacturer to greater liability: California's proximate-cause requirement, a version of which also applies under Georgia law,

34

served as an independent basis for rejecting a design-defect claim on a motion to dismiss.

Notably, in concluding that a manufacturer should owe no design duty in particular cases of product misuse, other cases on which Snap relies likewise focused on considerations that would be highly relevant to a Georgia proximate-cause analysis. See, e.g., *Durkee v. C.H. Robinson Worldwide*, 765 FSupp.2d 742, 750 (W.D. N.C. 2011) (concluding, on a motion to dismiss, that the manufacturer of a texting system in a driver's truck did not owe any design duty to injured plaintiffs in another vehicle because "[t]he alleged accident in this case was caused by the driver's inattention [while using the texting system], not any element of the design or manufacture of the system that has been alleged"), aff'd sub nom. *Durkee v. Geologic Solutions*, 502 Fed. Appx. 326 (4th Cir. 2013);[8] *Estate of Doyle v. Sprint/Nextel Corp.*, 248 P3d 947, 951 (Ok.

_____

[8] In concluding that the manufacturer did not have a duty to design its texting system to prevent use while traveling at interstate highway speeds, *Durkee* relied on two additional rationales that we find unpersuasive. First, the court noted that North Carolina law did not recognize a duty owed by

Civ. App. 2011) (holding at the motion-to-dismiss stage that cell-phone manufacturers did not owe a duty to warn of the danger of using a cell phone while driving because "it is not necessarily foreseeable that [cell-phone use] will cause a collision or unreasonably endanger a particular class of persons," and "[i]t is not reasonable to anticipate injury every time a person uses a cellular phone while driving"); *Halbrook v. Honda Motor Co.*, 569 NW2d 836, 839-840 (II) (B), 840 (II) (C) (Mich. App. 1997) (holding, based on the pleadings, that "an automobile manufacturer's duty of reasonable care does not extend to reducing the speed and acceleration capabilities of its vehicles" because it is "not certain that a motorcycle designed to travel in excess of the speed limit and accelerate quickly will cause injury to others," "[t]he risk of harm is

---

manufacturers to non-users of a product. See *Durkee*, 765 FSupp.2d at 748, 752. As explained in Divisions 2 and 4 above, Georgia law is to the contrary. Second, the court concluded that, "[i]f manufacturers or designers of products had a legal duty to third parties to anticipate improper use of their products[,] then no product that would potentially distract a driver could be marketed." Id. at 749. *Durkee*'s causation analysis discussed above, however, demonstrates that this overbroad statement is untrue, as manufacturers are not liable for injuries not proximately caused by an alleged defect, and the risk-utility analysis also addresses this concern.

dependent, in part, on the way the driver handles the vehicle," injuries might not be averted "[e]ven if vehicles were designed to travel no faster than the maximum highway speed limit," and the product design "did not cause [the driver] to disobey the law").[9]  One case on which Snap relies even skipped the duty analysis entirely and dismissed a design-defect claim involving intentional misuse based solely on lack of causation.  See *Meador v. Apple, Inc.*, 911 F3d 260, 263 (I), 267 (III) (5th Cir. 2018) (affirming the dismissal of a design-defect claim alleging a duty to implement lock-out features on a cell phone because a "neurobiological compulsion to engage in texting behavior" triggered by receipt of a text message was not a substantial factor in causing a vehicular collision and therefore "could not be a cause in fact of the injuries").

Similarly, Snap and its amici curiae rely upon cases that

---

[9] Although *Halbrook* also noted that motor vehicle manufacturers were not in the best position to assume the costs of litigation and liability for "careless misuse of their products by negligent drivers" and that the court was "not willing to hold them liable for the consumers' misuse of their products," *Halbrook*, 569 NW2d at 840 (II) (B), 840 (II) (C), there is no indication that the result of the case would have been different had the court relied solely on proximate-cause-related considerations.

performed what might be characterized as a Georgia risk-utility

"breach" analysis in reaching a conclusion on summary judgment

that a manufacturer did not have a "duty" in certain cases of

intentional misuse. In *Elsroth v. Johnson & Johnson*, 700 FSupp.

151 (S.D. N.Y. 1988), for example, the court held that the

manufacturer of Tylenol gelatin capsules did not have a "duty" to

use a more tamper-resistant design in part because it was

impossible to make over-the-counter drugs tamper-proof, and the

FDA had concluded that it was not unreasonable to sell gelatin

capsules packaged in tamper-resistant packaging. See id. at 164-

165 (II) (B) (2) (b).[10]

---

[10] *Elsroth* also asserted that forcing drug manufacturers to design their products "as to anticipate and frustrate criminal tampering" would be "an unprecedented extension of the common law." *Elsroth*, 700 FSupp. at 164 (II) (B) (2) (b). This was so, the court implied, because applying such a principle in other cases would cause absurd results contrary to established law:

> Automobile manufacturers are not liable to those burglarized when automobiles are used to effectuate burglaries; telephone companies are not liable to those defrauded when the telephone lines are used to perpetrate fraudulent schemes; and handgun manufacturers are not liable to those injured when handguns are used to inflict criminal harm.

Snap and its amici curiae also cite at least one case that, consistent with our decisional law regarding design duties, concluded that no design duty was owed because the particular type of intentional, tortious product misuse at issue was so unlikely that the particular risk of harm from the product was not reasonably foreseeable. See, e.g., *Port Auth. of New York & New Jersey v. Arcadian Corp.*, 189 F3d 305, 315 (II) (E) (3d Cir. 1999) (holding at the motion-to-dismiss stage that a manufacturer had no duty to design its fertilizer products to be less capable of incorporation into explosive devices because, among other things, terrorists' "alteration and misuse of [the manufacturer's] fertilizer products were not objectively foreseeable").[11]

---

Id. Notably, however, our approach to design-defect claims would not necessarily imply that a manufacturer would be liable in such cases. As discussed in Divisions 2, 3, and 4 above, to establish that a manufacturer has a decisional-law design duty in a particular case, a plaintiff must show that the manufacturer could reasonably foresee that the product design posed the particular risk of harm at issue in the case. Further, a plaintiff must show breach and proximate causation.

[11] Other cases cited by Snap and its amici curiae are unpersuasive as they did not address design-defect claims. See, e.g., *Williams v. Cingular Wireless*, 809 NE2d 473, 475, 479 (I) (D) (Ind. Ct. App. 2004) (holding that Cingular Wireless had no duty not to furnish a cell phone to a third party who

Thus, we are unpersuaded that our decisional law regarding the design duty owed by manufacturers is out of step with other American jurisdictions. Categorizing certain considerations as relevant to breach or proximate causation, rather than duty, does not render our decisional law markedly different than that of the jurisdictions on which Snap and its amici curiae rely.[12]

later caused a car accident while using the phone); *Ely v. Gen. Motors Corp.*, 927 SW2d 774, 782 (Tex. App. 1996) (holding that a manufacturer had not breached a fiduciary duty to the public by advertising that its automobile could exceed the speed limit).

We note that Snap also cites for support *Schemel v. Gen. Motors Corp.*, 384 F2d 802 (7th Cir. 1967), which relied on *Evans v. Gen. Motors Corp.*, 359 F2d 822, 824 (7th Cir. 1966), to hold that an automobile manufacturer sued for negligently designing an automobile capable of speeding was "not bound to anticipate and guard against grossly careless misuse of his product by reckless drivers." *Schemel*, 384 F2d at 804-805. *Schemel*, however, was later overruled "[i]nsofar as the decision in *Schemel* rests on *Evans*," *Huff v. White Motor Corp.*, 565 F2d 104, 106 (II) n.1 (7th Cir. 1977), and it is unclear to what extent, if any, the United States Court of Appeals for the Seventh Circuit continues to consider *Schemel* good law.

[12] It is unsurprising to find that courts do not all analyze duty in precisely the same way, given that different jurisdictions have different conceptions of duty. As described in Division 2 above, Georgia law generally relies upon reasonable foreseeability as a principled basis for limiting the scope of a person's or entity's duty to act with reasonable care. By contrast, many of the jurisdictions discussed in this division have adopted duty tests that allow courts to make subjective value judgments and exercise significant discretion in determining whether to limit the scope of duties owed by particular types of defendants in particular types of cases. See, e.g., *Halbrook*, 569 NW2d at 839-840 (II) (A), (B) (considering, among other things, which "participants to the tragedy . . . were the most blameworthy" as part of a multi-factor test for determining whether the defendant manufacturer owed a design duty).

6. Finally, Snap and its amici curiae offer various public policy arguments for why manufacturers should owe no duty for purposes of a negligent-design claim when an injury results from intentional product misuse. Policy considerations "play an important role" in "fixing the bounds of duty," and we have "a responsibility to consider the larger social consequences of the notion of duty and to correspondingly tailor that notion so that the illegal consequences of wrongs are limited to a controllable degree." *CSX Transp. v. Williams*, 278 Ga. 888, 890 (608 SE2d 208) (2005) (citation and punctuation omitted); *CertainTeed Corp.*, 300 Ga. at 330 (2) ("To impose a duty that either cannot feasibly be implemented or, even if implemented, would have no practical effect would be poor public policy indeed." (citation and punctuation omitted)). Here, we are unpersuaded that policy considerations warrant further limiting a manufacturer's ordinary decisional-law design duty in cases of intentional, tortious product misuse.

First, Snap and its amici curiae argue that, absent a per se rule that manufacturers owe no duty not to negligently design a product

in cases of intentional product misuse, "almost any product capable of foreseeable, intentional misuse" would subject manufacturers "to a jury trial under the risk-utility test," leading to "devastating" litigation costs and "limitless" liability. We disagree. As described in Division 4 (d) above, intentional misuse may be a relevant factor in determining whether a manufacturer owed a decisional-law design duty with respect to a particular risk of harm, whether a manufacturer breached that duty, and whether the manufacturer's breach was the proximate cause of an injury. Thus, for a variety of reasons, pretrial adjudication — either at the motion-to-dismiss stage or on summary judgment — may be warranted with respect to certain negligent-design claims involving intentional product misuse. See, e.g., *McCarthy v. Olin Corp.*, 119 F3d 148, 155 (II) (A) (2d Cir. 1997) (dismissing for lack of breach a claim that hollow-point bullets were defectively designed "because the expanding of the bullet was an intentional and functional element of the design of the product," and "some products, for example knives, must by their very nature be dangerous in order to be functional"

(punctuation omitted)); *Briscoe v. Amazing Products*, 23 SW3d 228, 229-230 (Ky. Ct. App. 2000) (affirming the dismissal of a design-defect claim where neither the dangerous nature of a drain-cleaning product nor allegedly defective warnings on the product proximately caused a plaintiff's injuries because a criminal attack using the product was an unforeseeable superseding cause); *Port Auth. of New York & New Jersey*, 189 F3d at 319 (II) (F) (holding that any design defect in a manufacturer's fertilizer product was not the proximate cause of a terrorist bombing because a "bombing was not a natural or probable consequence" of the alleged design defect, and the terrorists' actions in incorporating the product into bombs were also "superseding and intervening events breaking the chain of causation").[13]

Further, even if certain negligent-design claims involving

---

[13] We express no opinion as to whether dismissal or summary judgment on risk-utility or proximate-cause grounds may be appropriate in this case. Further, although we concluded in Division 3 that the Maynards adequately alleged the duty component of their design-defect claim for purposes of a motion to dismiss, we express no opinion as to whether evidence regarding the foreseeability of risk from the product may ultimately warrant summary judgment on that element.

intentional misuse survive pretrial challenges and prevail before a jury, manufacturers will not be subjected to "limitless" liability. In cases where a jury finds that fault resides in the conduct of both a manufacturer and a product user, the doctrines of comparative negligence and apportionment operate to limit a manufacturer's liability to its degree of fault. See OCGA § 51-12-33 (a)-(c) (providing that a damages award may be reduced in proportion to a plaintiff's percentage of fault, that the resulting amount may then be apportioned among other persons according to their percentages of fault, and that the factfinder "shall consider the fault of all persons or entities who contributed to the alleged injury or damages" when determining percentages of fault); *Johns*, 310 Ga. at 161-162 (2), 170 (5). This is true even when a plaintiff's design-defect claim is premised on strict liability rather than negligence. See *Johns*, 310 Ga. at 169 (4) (c) ("[T]he application of comparative negligence is possible in strict products liability claims, where manufacturers and consumers of products are not engaged in traditional concerted action."). Thus, we are unpersuaded that manufacturers will face

44

"devastating" litigation costs and "limitless" liability. See *John Crane, Inc. v. Jones*, 278 Ga. 747, 751 (604 SE2d 822) (2004) (declining to diverge from longstanding negligence principles for public-policy reasons because the ordinary proximate-cause standard already addressed the relevant policy concerns).

In any event, the fact that some manufacturers may have to litigate negligent-design claims involving intentional misuse beyond the motion-to-dismiss stage and may ultimately be liable in proportion to their degree of fault does not offend Georgia public policy. As demonstrated by the Georgia product-liability statute and our decisional law described in Division 2 above, protecting the public from being harmed by defective products is an important aspect of this State's public policy. See *Alexander v. Gen. Motors Corp.*, 267 Ga. 339, 340 (478 SE2d 123) (1996) (noting that "the public policy of this state as expressed in [the product-liability] statute" is "to protect those who are injured by defective products

45

placed in the stream of commerce in this state").[14]  Moreover, in adopting a lenient notice-pleading standard, the General Assembly has opted to allow plaintiffs to seek discovery on many claims — not just product-liability claims — that may ultimately prove non-meritorious.  See *Norman v. Xytex Corp.*, 310 Ga. 127, 138 (2) (e) (848 SE2d 835) (2020) (noting that "the standard for granting a motion to dismiss is a demanding one" because "[a] complaint need only give fair notice of the claim").  Defendant manufacturers are not unique in having to bear the costs inherent in litigation.  Accordingly, we decline Snap's invitation to further limit a manufacturer's ordinary decisional-law design duty in cases of intentional product misuse.

7. The trial court granted Snap's motions to dismiss and for

---

[14] Although Snap points to several examples in which the General Assembly has by statute prohibited drivers from engaging in certain dangerous conduct while driving, we see nothing in those statutes suggesting that the General Assembly sought to relieve manufacturers of their own duties with respect to the products they sell, to the extent that they have any duties under the particular circumstances of a case, simply because a driver also breached a duty imposed by law.  See, e.g., OCGA § 40-6-241 (c) (Georgia's hands-free law prohibiting drivers from holding mobile phones while driving a motor vehicle on the highway); OCGA § 40-6-180 (making it illegal to "drive a vehicle at a speed greater than is reasonable and prudent").

judgment on the pleadings not only because it concluded that Snap owed no duty to Wentworth, but also because it concluded that any negligent design was not a proximate cause of Wentworth's injuries. The Court of Appeals, however, did not address the Maynards' challenge to the trial court's proximate-cause analysis. On remand, the Court of Appeals is directed to address whether the trial court erred in dismissing the Maynards' claims against Snap and in granting judgment on the pleadings to Snap for lack of proximate causation.

*Judgment reversed and case remanded with direction. All the Justices concur, except Boggs, P. J., Warren and McMillian, JJ., who concur specially in part, and Bethel and LaGrua, JJ., who dissent. Peterson and Ellington, JJ., disqualified.*

WARREN, Justice, concurring specially in part.

Because I believe the lead opinion[15] has faithfully applied

---

[15] A majority of the members of this Court have joined Divisions 1, 2, 3, 4, and 7 and the judgment of Justice Colvin's opinion. But because Divisions 5 and 6 have no majority, I will refer to Justice Colvin's opinion as the "lead opinion."

Georgia's lenient notice pleading standard for civil cases, as well as the relevant Georgia decisional law on products liability, I concur in the judgment in this case and concur fully in Divisions 1, 2, 3, 4, and 7. I write separately to explain my misgivings with Divisions 5 and 6 of the lead opinion.

Divisions 5 and 6 largely serve as a rebuttal of arguments made by Snap and amici curiae that Georgia products liability law would be an outlier among other jurisdictions and would "impos[e] a significantly greater scope of liability on manufacturers for design defects," Op. at 546, given that some other courts have granted product manufacturers' motions to dismiss in certain cases involving intentional, tortious misuse of a product. The lead opinion concludes that manufacturers do not "face significantly greater risk of liability under Georgia decisional law than under the law of other jurisdictions" because "the legal principles underlying the duty, breach, and proximate-cause elements of a negligent-design claim . . . collectively address the significant considerations other jurisdictions have relied upon in concluding that manufacturers owe

no design duty in particular cases of intentional, tortious product misuse." Op. at 546. Though it does not say so outright, the implication of this conclusion is that a manufacturer facing a design-defect claim under Georgia law may not be able to prevail at the motion-to-dismiss stage on the theory that the manufacturer did not owe a duty to the person who intentionally misused its product, but may nonetheless prevail at the summary-judgment stage—or perhaps at trial—after the manufacturer successfully has proven that the plaintiff cannot satisfy one or more elements of a design-defect claim. This implication, however correct, is not insignificant.

I generally agree with the lead opinion's conclusion that Georgia law does not "impos[e] a significantly greater scope of *liability* on manufacturers for design defects." Op. at 546 (emphasis supplied). In my view, however, the lead opinion's assessment of the end result too easily casts aside the costs and burdens that may be incurred along the way. Specifically, manufacturers may face significant discovery and other litigation expenses when (for example) a product user properly pleads that a manufacturer owed

49

her a duty, the case survives a motion to dismiss, and the manufacturer later prevails on summary judgment or at trial on what seems to be a fairly obvious (but fact-dependent) proximate causation argument—such as an intervening cause. Even if a manufacturer ultimately does not face liability for the alleged design defect, the cost of proceeding past a motion to dismiss is real, and it is one that is not acknowledged adequately in Divisions 5 and 6 of the lead opinion.[16]

At the same time, however, the notice pleading standard established by the General Assembly is a lenient one, and the lead opinion has analyzed carefully the allegations of the complaint in this case in light of that standard. Moreover, policy-related concerns about the real-world costs a manufacturer faces when it cannot prove at the outset that it owed no duty to an injured plaintiff as a matter of Georgia law—but can later show through discovery or at

---

[16] Of course, a manufacturer can prevail on a motion to dismiss on any element of a design-defect claim. But given the procedural posture of this case, the only element we are examining is duty, and whether the allegations of the plaintiff's operative complaint are sufficient here to allege duty under Georgia law.

trial that the design-defect claim fails on one or more elements—cannot displace our obligation to apply Georgia law, as the lead opinion does today.

Finally, I have studied the dissent and acknowledge that it makes an intuitively appealing argument that manufacturers should never owe a design duty to users for the "ways [a] product might be used in the commission of a crime." But that argument is completely devoid of legal authority and appears to be inconsistent with the Georgia authority on which the lead opinion relies, so I cannot join it.

For these reasons, I concur in the judgment and in Divisions 1, 2, 3, 4, and 7.


I am authorized to state that Presiding Justice Boggs and Justice McMillian join this opinion.

BETHEL, Justice, dissenting.

I agree with most of what is said in the majority opinion. By and large, I believe it accurately captures the current state of the law of Georgia. But, because I believe the majority expands and extends the design duty of manufacturers beyond what is reasonably

52

foreseeable, I respectfully dissent.

Of critical importance to my perspective is that I understand the theory of the case before us to be *dependent* on the product being used in the course of criminal behavior in order for the alleged tort to have been completed. This is not mere intentional or tortious misuse. Nor is it a case where a crime happened to be committed at the same time as the alleged tort. Rather, the Maynards' second amended complaint alleges that Snap's product was being used by McGee in the commission of several crimes under the laws of Georgia when the harm was inflicted. There was no allegation that the operation of the product itself could in any way cause the harm sustained independent of criminal behavior.

As the majority discusses at length, when a particular risk of harm from a product is not reasonably foreseeable, a manufacturer owes no design duty to reduce that risk. On that much, we agree. However, "reasonable foreseeability" necessarily includes fewer potential outcomes than "foreseeability." In my view, imposing a duty on a manufacturer at the design stage to account for and design

against its product being used in the commission of a crime falls beyond what is reasonably foreseeable under traditional principles of tort law.

Leaving for another day any consideration of a product designed specifically and solely for criminal use, the universe of reasonable uses of an otherwise legal product that a manufacturer must anticipate extends only to those uses that are lawful. When designing a product and considering the risks it poses, a manufacturer is not responsible for contemplating and guarding against the myriad ways the product might be used in the commission of a crime or crimes.[17] I know of no case in the decisional

---

[17] An alternate path to this conclusion is by considering how proximate causation informs duty in a tort case. As the majority acknowledges, lack of proximate causation can be determined in some cases as a matter of law, including when a criminal act by a third party is the alleged intervening cause. See, e.g., *Goldstein, Garber & Salama, LLC v. J. B.*, 300 Ga. 840, 843 (797 SE2d 87) (2017) ("Although questions of the foreseeability of intervening criminal acts are usually for the factfinder, when, as here, the evidence on the matter is plain and undisputable, it is properly for the court's adjudication."). Where, as here, the cause of action is dependent on criminal conduct in order to complete a design defect claim, I would hold that the causal chain is broken as a matter of law because the criminal conduct is an intervening cause of the injury. Thus, manufacturers should have no duty to design a product to guard against what are intervening causes as a matter of law.

law of this state, or in the common law adopted by this state, imposing a duty on manufacturers to design their products to preclude their use in a crime. And such a duty clearly does not arise from our products-liability statute. See OCGA § 51-1-11 (b) (1) (providing that manufacturers are liable when the property "sold by the manufacturer was not merchantable and reasonably suited to the use *intended*" (emphasis supplied)). In my view, this would be the first occasion where Georgia law was understood to impose a duty on manufacturers to account for the criminal conduct of others in the design of their product. I am not inclined to join in this judicial extension of our decisional law. Accordingly, I dissent.

I am authorized to state that Justice LaGrua joins in this dissent.

Decided March 15, 2022.

Certiorari to the Court of Appeals of Georgia — 357 Ga. App. 496.

*Bondurant Mixson & Elmore, Michael B. Terry, Naveen Ramachandrappa, Amanda K. Seals; Neff Injury Law, Michael L. Neff, D. Dwayne Adams, T. Shane Peagler, Susan M. Cremer; Henningsen Injury Attorneys, Todd R. Henningsen*, for appellants.

*Greenberg Traurig, Lori G. Cohen, Sean P. Jessee, Andrew Z. Smith; Gower Wooten & Darneille, Anne D. Gower, Robert D. Johnson; Munger Tolles & Olson, Jonathan H. Blavin, John B. Major, Anne K. Conley*, for appellee.

*Rogers & Fite, Brian D. Rogers; Warshauer Law Group, Lyle G. Warshauer; Hotchkiss Law Firm, Paul I. Hotchkiss; Hasty Pope Davies, Jonathan A. Pope; Bey & Associates, N. John Bey; The Ashby Firm, Andrew S. Ashby; King & Spalding, W. Ray Persons; Rogers & Hardin, Michael L. Eber*, amici curiae.