**FOURTH DIVISION**
**DILLARD, P. J.,**
**MERCIER and MARKLE, JJ.**

**NOTICE: Motions for reconsideration must be** *physically received* **in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**https://www.gaappeals.us/rules**

**October 17, 2022**

# In the Court of Appeals of Georgia

A22A0797. WHITEHEAD et al. v. GREEN AS THE PARENT OF GREEN, DECEASED MINOR et al.

A22A0798. WHITE POOLS, INC. v. GREEN AS THE PARENT OF GREEN, DECEASED MINOR et al.

DILLARD, Presiding Judge.

This case involves consolidated appeals—Case Numbers A22A0797 and A22A0798—that come to us by way of granted interlocutory applications.

In Case Number A22A0797, Tahir and Shannon Whitehead appeal from the trial court's denial of their motion for summary judgment in a wrongful-death action brought by Ebony Green, as the parent of Tamira Green (a deceased minor) and administrator of the child's estate. Specifically, the Whiteheads argue the trial court erred in (1) denying their motion for summary judgment when there were no genuine

issues of material fact, and (2) denying their motion to strike testimony from Green's expert witnesses.

In Case Number A22A0798, White Pools, Inc. appeals from the trial court's denial of its motion for summary judgment in the same action brought by Ebony Green. In doing so, White Pools—the company that built the Whiteheads' pool—argues the trial court erred in denying its motion for summary judgment when (1) Green did not establish there were industry standards creating a duty to warn, educate, or inform a homeowner as to certain information; (2) there was no evidence that certain features of the Whiteheads' pool caused Tamira's injury; (3) the pool was not a product subject to strict liability; (4) there is no duty to warn of specific dangers associated with a product for which the dangers are open and obvious; (5) there was no evidence that a failure to warn more likely caused Tamira's injuries; (6) it is not the manufacturer of one of the pool's features; (7) it did not undertake to instruct the Whiteheads on general pool safety; and the trial court erred in admitting testimony from Green's expert witnesses when (8) the experts were not properly qualified to give their opinions, and (9) the opinions were unreliable for a number of reasons.

For the reasons set forth *infra*, we reverse in both cases.

2

Viewed in the light most favorable to Green (*i.e.*, the nonmovant),[1] the record shows that on July 3, 2017, the Whiteheads hosted an Independence Day party, during which they also celebrated the birthday of a family friend, Vanessa Davis. Davis—with the Whiteheads' permission—invited some relatives to the party, including Rolinda and Bernard Bond, who did not know the Whiteheads and had never been to their home before.

The Bonds brought their 4-year-old granddaughter, Tamira Green, to the party with her swimsuit in anticipation of there being some form of water activities for children. The Bonds were both aware that Tamira did not know how to swim, and when they arrived, they asked another relative, Jaida Davis, if Tamira could get into the Whiteheads' pool with her and her baby niece. It is undisputed that Rolinda and Bernard also did not know how to swim and had no intention of getting into the pool.

When Jaida agreed to watch Tamira, the Bonds began to socialize with other guests, with Rolinda moving into the house and Bernard remaining outside in a nearby seating area while Tamira sat beside Jaida on the edge of the pool. After a while, Rolinda saw Jaida come into the house and asked where Tamira was, to which

---

[1] *See, e.g.*, *Martin v. Herrington Mill, LP*, 316 Ga. App. 696, 696 (730 SE2d 164) (2012).

3

Jaida responded that she did not know. Rolinda then began looking for her granddaughter throughout the party and its many activities, which included an inflatable bouncy house for children; but she could not find Tamira. Rolinda then noticed another guest carrying a small child out of the pool and realized it was granddaughter. Tragically, despite all best efforts (including CPR), being transported to a hospital,[2] and spending several days on life support, Tamira never regained consciousness and was pronounced dead on July 6, 2017.

Bernard could not recall seeing Jaida leave the pool area or speaking with her again after initially asking her to watch Tamira, and he did not realize anything was amiss until his wife informed him that Tamira drowned. A video from a surveillance camera positioned over the Whiteheads' backyard shows Jaida exit the pool with her baby niece and pause for several seconds within feet of Bernard to speak with him before leaving the area. And according to a police report filed after the incident, Jaida informed Bernard that she was leaving the pool so he would watch Tamira in her absence.

---

[2] Unfortunately emergency personnel were delayed in reaching the home due to confusion regarding its location.

In the surveillance video, Bernard is standing beside the pool when he is approached by Jaida. He then looks at Tamira, who is on or near the pool's tanning shelf, before walking away. Within seconds of Bernard turning and walking away, Tamira fully enters the pool and slips beneath the water. Although she attempts to resurface—her arms below the water and face barely breaking through each time[3]—she travels further into the pool; and less than one minute later, she slips under the water for the last time. All of this occurs while other children play and swim around her, and no fewer than four adults sit just feet away from the pool's edge, eating and socializing. But despite the large number of guests who were in the pool area (sitting along its edge or congregating nearby), Tamira was not discovered until 13 minutes after her struggle to resurface—when a swimmer's leg bumped into her body at the bottom of the pool, at which point she was pulled from the water.

---

[3] The popular conception of what drowning looks like—with arms flailing and victims crying for help—is rarely accurate. In actuality, drowning victims are often not able to call for help; their mouths alternately sink below and reappear above the water's surface; they cannot wave for help; they cannot voluntarily control their arm movements; and their bodies instinctively remain upright in the water, providing no signs of supporting kicks. *See* Mario Vittone, *What Drowning Really Looks Like*, Divers Alert Network (Feb. 1, 2020), https://dan.org/alert-diver/article/what-drowning-really-looks-like/ (last visited October 11, 2022).

An investigation by the local sheriff's office concluded that Bernard "failed to supervis[e]" Tamira. Ebony Green—Tamira's mother—told law enforcement that she did not wish to press charges against Bernard, her stepfather; but she thereafter filed a wrongful death action against the Whiteheads and White Pools—the company that built the Whiteheads' pool[4]—on behalf of her daughter's estate. Both the Whiteheads and White Pools proceeded to file motions for summary judgment and motions to strike testimony from Green's experts.

Following a hearing, the trial court denied the Whiteheads' motion for summary judgment, concluding that genuine issues of material fact remained as to whether they breached a duty of care to warn guests of a hidden hazard—*i.e.*, that certain features of their pool could obscure objects at the bottom, and whether they breached a duty they voluntarily assumed by announcing floatation devices for use but failing to identify non-swimmers and provide them with such protection. The court further concluded there were genuine issues of material fact as to causation and rejected the Whiteheads' contention that the lack of supervision by the child's grandparents was to blame when expert testimony suggested that, in the absence of

_____

[4] Additional facts and details regarding White Pools's involvement and Green's claims against the company are provided *infra*.

6

the pool-design features selected by the Whiteheads, the child would have been noticed by other guests.

Likewise, the trial court denied the Whiteheads and White Pools's motions to strike the testimony of Green's expert witnesses, Dr. Thomas Griffiths and Dr. Gerald Dworkin, as to the pool's features, visibility, drowning risks, and applicable standards of care. The court rejected White Pools's contention that the experts lacked proper qualifications to render their opinions. It also rejected the assertion that the experts' opinions were unreliable. But as to both the Whiteheads and White Pools, the trial court granted certificates of immediate review. We then granted their applications for interlocutory appeal, and these consolidated appeals follow.

Summary judgment is, of course, proper when "there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law."[5] Furthermore, a *de novo* standard of review "applies to an appeal from a grant or denial of summary judgment, and we view the evidence, and all reasonable conclusions and inferences drawn from it, in the light most favorable to the nonmovant."[6] Finally, at the summary-judgment stage, we do not "resolve disputed

---

[5] OCGA § 9-11-56 (c); *accord Martin*, 316 Ga. App. at 697.

[6] *Martin*, 316 Ga. App. at 697 (punctuation omitted).

facts, reconcile the issues, weigh the evidence, or determine its credibility, as those matters must be submitted to a jury for resolution."[7] With these guiding principles in mind, we turn now to the enumerations of error in each appeal.

1. *Case No. A22A0797*

(a) For starters, the Whiteheads argue the trial court erred in denying their motion for summary judgment when there were no genuine issues of material fact as to whether they were negligent. We agree.

The essential elements of a negligence claim are "the existence of a legal duty; breach of that duty; a causal connection between the defendant's conduct and the plaintiff's injury; and damages."[8] As a result, we must first identify the duty of care the Whiteheads owed to Tamira, which is the threshold issue in causes of action for negligence.[9]

---

[7] *Tookes v. Murray*, 297 Ga. App. 765, 766 (678 SE2d 209) (2009).

[8] *Stadterman v. Southwood Realty Co.*, 361 Ga. App. 613, 615 (1) (865 SE2d 231) (2021) (punctuation omitted); *accord Seymour Elec. & Air Conditioning Serv., Inc. v. Statom*, 309 Ga. App. 677, 679 (710 SE2d 874) (2011).

[9] *See Martin v. Ledbetter*, 342 Ga. App. 208, 211 (802 SE2d 432) (2017) ("[A] threshold issue in any cause of action for negligence is whether, and to what extent, the defendant owes the plaintiff a duty of care. Whether a duty exists upon which liability can be based is a question of law. In the absence of a legally cognizable duty, there can be no fault or negligence."); *accord City of Rome v. Jordan*, 263 Ga. 26, 27

As a social guest in the Whiteheads' home, Tamira was a licensee.[10] And a property owner incurs liability for breaching a duty to a licensee "only for wilfully or wantonly allowing a dangerous static condition . . . to cause [her] injuries."[11] In other words, under Georgia law, a property owner owes a licensee a duty not to wilfully and wantonly injure her, and the property owner cannot *knowingly* let a licensee run

---

(426 SE2d 861) (1993); *Holcomb v. Walden*, 270 Ga. App. 730, 731 (607 SE2d 893) (2004).

[10] *See* OCGA § 51-3-2 (a) (1)-(3) ("A licensee is a person who . . . [i]s neither a customer, a servant, nor a trespasser; . . . [d]oes not stand in any contractual relation with the owner of the premises; and . . . [i]s permitted, expressly or impliedly, to go on the premises merely for his own interests, convenience, or gratification."); *Thompson v. Oursler*, 318 Ga. App. 377, 378 (733 SE2d 359) (2012) ("Georgia has adopted the rule that a social guest is not an invitee but is a licensee." (punctuation omitted)); *Pope v. Workman*, 211 Ga. App. 263, 263 (439 SE2d 86) (1993) ("[A]s a social guest, [Appellant's] legal status was as a licensee."). *See generally Cham v. ECI Mgmt. Corp.*, 311 Ga. 170, __ (2) (a) (856 SE2d 267, 271 (2) (a)) (2021) (explaining the differences between invitees, licensees, and trespassers). We disagree with Green that Tamira's status "is a fact-intensive inquiry" by virtue of the Bonds having been invited by another party guest. The case upon which Green relies, *Cham*, *supra*, held there was a genuine issue of material fact as to the deceased party's status when there was evidence he was invited to stay on the property by the defendant-landlord's tenant but there was a dispute as to whether the defendant-landlord gave the tenant permission for the deceased party to stay on the property. 311 Ga. at __ (1) (856 SE2d at 269-72 (1)). Here, it is undisputed that the Whiteheads gave Vanessa Davis permission to invite others guests, such as the Bonds, and the Bonds *and* Tamira had permission to be at the premises for the party on the day in question.

[11] *Thompson*, 318 Ga. App. at 378; *see also* OCGA § 51-3-2 (b) ("The owner of the premises is liable to a licensee only for willful or wanton injury.").

9

upon a hidden peril on the premises or wilfully cause her harm.[12] Additionally, "wanton conduct" has been defined as "that which is so reckless or so charged with indifference to the consequences as to be the equivalent in spirit to actual intent to do harm or inflict injury."[13] But importantly, a property owner must actually *know* about and foresee a dangerous condition before a duty to protect arises.[14]

Suffice it to say, the mere ownership of a swimming pool does not make a property owner liable for a licensee's injuries. Indeed, a property owner is not an insurer of social guests, and the Whiteheads are not presumed to be negligent "merely

---

[12] *Pope*, 211 Ga. App. at 263.

[13] *Trulove v. Jones*, 271 Ga. App. 681, 681 (1) (610 SE2d 649) (2005) (punctuation omitted); *accord Matlack v. Cobb Elec. Membership Corp.*, 289 Ga. App. 632, 634 (658 SE2d 137) (2008); *see Chrysler Corp. v. Batten*, 264 Ga. 723, 726 (3) (450 SE2d 208) (1994) ("Wilful conduct is based on an actual intention to do harm or inflict injury; wanton conduct is that which is so reckless or so charged with indifference to the consequences as to be the equivalent in spirit to actual intent." (punctuation omitted)).

[14] *See Brown v. Dickerson*, 350 Ga. App. 137, 139 (828 SE2d 376) (2019) ("[T]he danger[ous] [condition] must be known and foreseen by the property owner before a duty to protect exists." (punctuation omitted)); *see also Rogers v. Woodruff*, 328 Ga. App. 310, 316 (761 SE2d 852) (2014) (physical precedent only) ("[B]ecause there is no evidence by which [the property owner] could be said to have superior knowledge of the deck railing's allegedly dangerous condition, the trial court erred in denying her motion for summary judgment." (footnote omitted)); *Cooper v. Corp. Prop. Invs.*, 220 Ga. App. 889, 891 (470 SE2d 689) (1996) ("The test for liability . . . is the proprietor's superior knowledge of the hazard.").

10

because [Tamira] sustained [her] injury while rightfully on their premises."[15] Further, it is well established that the existence of a swimming pool is open and obvious, and a pool is not a *per se* pitfall or mantrap.[16]

Here, Green contends—and the trial court agreed—that there are genuine issues of material fact as to whether specific features of the Whiteheads' pool constitute hidden perils about which they had a duty to warn their social guests. Specifically, Green points to the testimony of her two experts, who opined that the pool's liner, tanning shelf, darkly colored interior, and waterfall features made it difficult for guests to notice Tamira at the bottom until 13 minutes after she slipped under the water. She also argues the trial court correctly concluded there are genuine

[15] *Pope*, 211 Ga. App. at 263; *see Bowers v. Grizzle*, 214 Ga. App. 718, 720 (4) (448 SE2d 759) (1994) (physical precedent only) ("A party [host] is not an insurer of social guests; nor does mere ownership or physical control over a swimming pool result in absolute liability for injuries sustained by social guests.").

[16] *See Hemphill v. Johnson*, 230 Ga. App. 478, 481 (2) (497 SE2d 16) (1998) ("The existence and condition of [the homeowner's] pool was open and obvious. Further, a swimming pool is not per se a mantrap."); *Bowers*, 214 Ga. App. at 720 (4) (physical precedent only) ("This is not a case involving a hidden defect; the existence and condition of the pool were open and obvious; a swimming pool is not per se a pitfall or mantrap."); *see also Oliver v. City of Atlanta*, 147 Ga. App. 790, 792 (3) (250 SE2d 519) (1978) (declining to find that swimming pool was a mantrap).

11

issues of material fact as to whether the Whiteheads voluntarily assumed a duty to render services to another by their invitation to use floatation devices.

As to whether the Whiteheads had a duty to warn social guests about specific features of their pool, a number of courts in other states have concluded that when a condition within a swimming pool is itself open and obvious (such as cloudy water, which can decrease visibility of people and objects), pool owners have no duty to warn of such conditions.[17] This is, of course, in stark contrast with conditions that are

[17] *See City of El Paso v. Collins*, 483 SW3d 742, 754 (Tex. App. 2016) ("If in fact the [appellees] had alleged in their pleadings that the cloudy water was the only dangerous condition existing at the pool at the time of [the child's] accident, we would agree with the City that the [appellees'] own pleadings negated the existence of any duty owed by the City [to warn of the dangerous condition], in light of the open and obvious dangers associated with swimming in cloudy water."), *abrogated on other grounds by Town of Shady Shores v. Swanson*, 590 SW3d 544 (Tex. 2019); *Mullens v. Binsky*, 719 NE2d 599, 606 (Ohio Ct. App. 1998) ("Even assuming that the clarity of the water did constitute a dangerous condition, this condition was equally apparent to the decedent. As stated, the defendant was under no duty to warn of conditions which were open and obvious to all guests swimming in the pool. Thus, plaintiff's contention that poor water clarity hindered the decedent's rescue can only be based upon speculation, and is improper for avoiding a motion for summary judgment." (punctuation omitted)); *Grimes v. Hettinger*, 566 SW2d 769, 773 (Ky. Ct. App. 1978) ("Assuming that the clarity of the water did constitute a dangerous condition, this condition was as evident to [the swimmer] as it was to [the pool owner]. He was under no duty to warn [the swimmer] of a condition which was readily apparent."). *Cf. City of Eatonton v. Few*, 189 Ga. App. 687, 691 (5) (377 SE2d 504) (1988) ("The evidence did not demand a finding that appellees' decedent, by voluntarily leaving the clear shallow end of the [public] swimming pool, assumed, as a perceived risk, the likelihood that he, as a poor swimmer, would not be rescued [by

12

*not* open and obvious, such as pool drains with dangerous suction power[18] or pool depths that are difficult to decipher.[19]

---

the lifeguard] should he encounter difficulties in the cloudy deep end of the pool. The evidence was, however, sufficient to create a jury issue in this regard."), *disapproved of on other grounds by Driskell v. Dougherty Cnty.*, __ Ga. App. __ (871 SE2d 283) (Ga. Ct. App. 2022); *Ward v. City of Millen*, 162 Ga. App. 148, 150 (290 SE2d 342) (1982) (physical precedent only) (noting and collecting cases concerning swimming injuries incurred in *public pools with lifeguards*, and which cases "have held that the murkiness of water in which a drowning victim has been bathing may be alleged and proved as negligence providing there is a relationship between the condition of the water and the injury to the victim; although if the evidence shows that the death would have occurred in any event the condition, although resulting from negligence, is not actionable as a concurrent proximate cause").

[18] *See City of El Paso*, 483 SW3d at 755 ("[The appellees] have properly pleaded that the City was aware of not only the cloudy condition of the water, but also a hidden defect at the pool which caused [the child's] near-drowning, *i.e.*, the suction allegedly occurring at the drain site that caused [the child] to become entrapped or entangled. At the pleading stage, we find these factual allegations sufficient to support a claim for premises liability[.]").

[19] *See Jackson v. Krygsheld*, Case No. 163209-U, ¶ 42, at *9 (Ill. App. 1st Dist. 2018) (*"*In this case, we find there is a material question as to the obviousness of the danger in defendant's pool, *i.e.*, the above-ground swimming pool with an unobservable deep end."); *Duffy v. Togher*, 887 NE2d 535, 546 (Ill. App. Ct. 2008) (holding that summary judgment was precluded when a "combination of a number of factors about the . . . pool came together to create a distraction" or "an optical illusion" by which swimmer believed he was diving into the deep end of the pool but was actually diving into the shallow end); *see also Brazier v. Phoenix Grp. Mgmt.*, 280 Ga. App. 67, 71 (1) (a) (633 SE2d 354) (2006) ("This Court has repeatedly recognized that lakes, ponds, and similar bodies of water, either natural or manmade, are open and obvious hazards, even to small children."). *Cf. Murphy v. D'Youville Condo. Ass'n, Inc.*, 175 Ga. App. 156, 157 (333 SE2d 1) (1985) ("There is no duty

But regardless of whether the relevant pool features constituted a hidden hazard, Green is still be required to show the Whiteheads had *knowledge* of and could foresee the additional danger posed by such features;[20] but there is no such evidence in the record. Indeed, the Whiteheads testified they never had trouble seeing swimmers beneath the water of their pool with the features Green's experts opined created a hidden danger of reduced visibility.[21] And although Green attempts to liken

to warn of the shallowness of a pool if, as is uncontradicted here, the fact is apparent and known to the plaintiff.").

[20] *See London Iron & Metal Co. v. Abney*, 245 Ga. 759, 761 (2) (267 SE2d 214) (1980) ("A possessor of land is subject to liability for physical harm caused to licensees by a condition on the land if, but only if, (a) the possessor knows or has reason to know of the condition and should realize that it involves an unreasonable risk of harm to such licensees, and should expect that they will not discover or realize the danger, and (b) he fails to exercise reasonable care to make the condition safe, or to warn the licensees of the condition and the risk involved, and (c) the licensees do not know or have reason to know of the condition and the risk involved." (punctuation omitted)); *Thompson v. Oursler*, 318 Ga. App. 377, 378 (733 SE2d 359) (2012) (same); *Collins v. Glover*, 273 Ga. App. 352, 353 (615 SE2d 194) (2005) (same).

[21] *Cf. Coates v. Mulji Motor Inn, Inc.*, 178 Ga. App. 208, 211 (2) (342 SE2d 488) (1986) (physical precedent only) ("There was evidence that the motel owner had operated the motel for over a year, had learned how to maintain the pool, knew that the underwater light was there and that it was in part a safety device, knew that there was a steep slope, was experienced in caring for the pool, had observed its use by guests under various conditions, used it himself, and was familiar with its characteristics. From this background, the jury could find that the innkeeper had superior knowledge of the greater degree of dangerousness, the greater risk, which

14

this case to those in which defective construction is alleged, as further discussed in Division 2 *infra*, there is no evidence the Whiteheads' pool was in any way defectively constructed.[22] Instead, rather than suggest the pool or its features were

the physical conditions presented. It is not really a case of patent versus latent physical defect, but rather a case of patent versus latent significance and meaning, i.e., danger, of the defects.").

[22] *See Murphy*, 175 Ga. App. at 157 ("In support of a contention that his injuries were caused by negligent design and construction of the pool, appellant asserts that the evidence shows that there was a 'hump' in the pool bottom at the point where appellant dived. Our review of the record does not reveal support for that contention. . . Contrary to appellant's conclusion, the survey shows only what the builder of the pool testified was the intended contour of the bottom of the pool, deepest in the middle and growing gradually shallower as it approached the sides"); *Shetter v. Davis Bros.*, 163 Ga. App. 230, 231 (293 SE2d 397) (1982) ("The purported design flaw which appellant alleges to be the cause of his injury is the use of a diving board of a height and length suitable for a competition-size pool in a pool too shallow for such a board. There are conflicts in the evidence as to whether the design of the pool is defective. Our view of the evidence is that there is a question of fact as to whether the pool, as constructed by appellee, is inherently or intrinsically dangerous. If it is, appellee is not insulated from liability by the fact that the pool was accepted and approved by the owner."). *Cf. Hicks v. Walker*, 262 Ga. App. 216, 219 (585 SE2d 83) (2003) ("There is no evidence that the [homeowners] actually knew about the deck's dangerous condition. However, there is evidence from which a jury could find that the [homeowners] at least had constructive knowledge of the defects because the defects were construction defects, because the defects amounted to code violations, or because the defects could have been discovered through the exercise of reasonable care in inspecting the deck."); *Murray v. W. Bldg. Materials of Ga.*, 243 Ga. App. 834, 834 (534 SE2d 204) (2000) (physical precedent only) ("[Appellant] opposed the motion [for summary judgment] with deposition testimony from . . . a structural engineer, who averred that . . . [the] front steps and handrail deviated from the requirements of the applicable building code. . . . These defects, the expert

*defectively constructed* or violated construction codes or building standards for residential pools, Green's experts opined the pool builder should have warned the Whiteheads about its features. And it is undisputed the pool builder did not do this, which gives rise to some of Green's claims against the pool builder, discussed *infra*.

Thus, in light of the foregoing, there is no evidence the Whiteheads had—or should have had—knowledge that specific features of their pool were hidden perils.[23] There is also no evidence Tamira would have been discovered earlier if the Whiteheads *had* provided warnings to guests about the pool features. It is, then, mere speculation that any warnings by the Whiteheads—even if they had been required to

---

concluded, could have caused [the appellant's] fall."); *Freyer v. Silver*, 234 Ga. App. 243, 245 (507 SE2d 7) (1998) ("In reply to defendants' motions [for summary judgment], plaintiff . . . submitted the affidavit of . . . a licensed professional engineer, who deposed that the catch basin was defectively designed and constructed."); *Hardeman v. Spires*, 232 Ga. App. 694, 695 (503 SE2d 588) (1998) ("The expert concluded that the porch posed an unreasonable hazard and that plaintiff's injuries could have been avoided had [the property owner] not violated [a] safety code standard. This evidence not only meets [the] first [requirement] that there be some indication that [the property owner] had actual knowledge of the hazard, but is also sufficient to authorize a finding that [the property owner] was negligent or even negligent as a matter of law in maintaining her porch.").

[23] *See supra* note 20 & accompanying text.

give them—would have led to an earlier discovery of Tamira.[24] Indeed, there is no

evidence the Bonds would have acted differently while supervising Tamira if they

*had* been warned that particular features of the Whiteheads' pool reduced visibility

---

[24] *See R & R Insulation Servs., Inc. v. Royal Indem. Co.*, 307 Ga. App. 419, 427 (3) (705 SE2d 223) (2010) ("A breach of a duty to warn, however, must also be the cause of the injury about which the plaintiff complains, and the plaintiff must present evidence supporting a reasonable inference that the warning provided by the defendant would prevent the injury."); *see also Sturdivant v. Moore*, 282 Ga. App. 863, 865-66 (640 SE2d 367) (2006) (noting that there was no "evidence as to how much more quickly [the decedent] could have been discovered had the pool been illuminated by an interior light" and thus "it would be mere speculation to conclude that [the residential property owner's] failure to turn on the pool light at some unspecified earlier time caused [the decedent's] death [by drowning]").

of swimmers.[25] Accordingly, the trial court erred in denying summary judgment to the

Whiteheads on this claim.[26]

---

[25] *See Plantation at Lenox Unit Owners' Ass'n, Inc. v. Lee*, 196 Ga. App. 420, 422-23 (2) (395 SE2d 817) (1990) ("[The] plaintiff admitted he saw nothing by which he could judge the depth of the pool. Under these circumstances, it cannot be said that failure to light the pool or any other negligent act or omission on the part of defendants contributed to plaintiff's misjudgment or, more accurately, failure to judge the depth of the water before diving. . . . To rule that a jury issue remains would be to assume that the maintenance of any swimming pool necessarily involves an invitation to dive in blind reliance on the safety of such an act without any duty of the actor to use his or her sight, experience or judgment in ordinary care for his own safety. In other words, because plaintiff admitted he relied on nothing to judge the safety of his act, to rule that an issue of negligence remains would be to ignore the Georgia doctrine of avoidable consequences."); *Maldonado v. Walmart Store No. 2141*, Case No. CIV.A. 08-3458, 2011 WL 1790840, at *16 (IV) (C) (1) (b) (E.D. Pa. May 10, 2011) ("[T]here is insufficient evidence in this case for a jury to reasonably conclude that additional warnings may have prevented [the child's] injuries and subsequent death. Plaintiff was aware of the risk posed by the pool to unsupervised children and made an attempt to ensure [the child] was supervised, with the knowledge of these risks.").

[26] For all of these same reasons, to the extent Green asserts that—as an alternative to premises liability—the Whiteheads were actively negligent by failing to "implement a reasonable safety plan for their guests," we are unpersuaded. And the two cases upon which Green relies for this assertion are wholly inapposite. *See Byrom v. Douglas Hosp., Inc.*, 338 Ga. App. 768, 773 (792 SE2d 404) (2016) (reversing grant of summary judgment to defendant hospital when there were genuine issues of material fact as to whether nurse was actively negligent in transporting patient in wheelchair); *Lipham v. Federated Dep't Stores, Inc.*, 263 Ga. 865, 865 (440 SE2d 193) (1994) (reversing grant of summary judgment to department store when there were genuine issues of material fact as to whether store employee was actively negligent when he bumped into and knocked plaintiff to the ground).

(b) We likewise reject the contention that there is a genuine issue of material fact as to whether the Whiteheads "voluntarily assumed" a duty to protect Tamira and other guests, under Restatement (Second) of Torts §324A, when Shannon announced that floatation devices were available for children and non-swimmers and indicated where the devices could be found. That principle, as adopted by the Supreme Court of Georgia, provides that

> [o]ne who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if (a) his failure to exercise reasonable care increases the risk of such harm, or (b) he has undertaken to perform a duty owed by the other to the third person, or (c) the harm is suffered because of reliance of the other or the third person upon the undertaking.[27]

And as our Supreme Court has recognized, Section 324A "[a]pplies only to the extent that the alleged negligence of the defendant exposes the injured person to a greater

---

[27] *Herrington v. Gaulden*, 294 Ga. 285, 287 (751 SE2d 813) (2013) (punctuation omitted).

19

risk of harm than had existed previously."[28] The announcement that flotation devices were available for use did not expose any guests to a greater risk of drowning than already existed by virtue of swimming in or congregating around a pool; and it cannot reasonably be construed as an undertaking to further warn guests about the risks of drowning in the pool.[29] For that matter, there is no indication that Shannon's announcement induced the Bonds to seek a floatation device for their granddaughter.

Needless to say, it would normally be "the duty of a parent or other adult having primary supervisory control over the child to see to it that a child would not be going into a place of obvious danger."[30] After all, a swimming pool is, as a matter of law, an open and obvious danger.[31] To be sure, the facts of this case are undeniably tragic and heartbreaking. Even so, it is undisputed that Tamira's grandfather

---

[28] *Herrington*, 294 Ga. at 288; *accord Fair v. OCGA § Underground, LLC*, 340 Ga. App. 790, 796 (3) (798 SE2d 358) (2017).

[29] *Herrington*, 294 Ga. at 288 ("[T]he mere failure to abate a hazardous condition—without making it worse—does not trigger the application of Section 324A (a)."); *Fair*, 340 Ga. App. at 796 (3) (same).

[30] *Bowers*, 214 Ga. App. at 720 (4) (physical precedent only) (punctuation omitted); *accord Rice v. Elliott*, 256 Ga. App. 87, 87 (567 SE2d 721) (2002); *Herron v. Hollis*, 248 Ga. App. 194, 196 (1) (546 SE2d 17) (2001); *Wright v. Shoney's of Savannah*, 141 Ga. App. 362, 363 (233 SE2d 474) (1977).

[31] *See supra* notes 15-16 & accompanying text.

(Bernard) was supposed to be supervising the child at the time of the incident, and he was unquestionably negligent in failing to do so.[32] So, given the foregoing facts (including the Bonds' undisputed knowledge that Tamira could not swim), the Whiteheads cannot be held responsible for the death of Tamira,[33] and "[t]o hold otherwise would be to make [them] strictly liable for injuries to the child which resulted from a failure of the child's [grandfather] to properly supervise her."[34]

Accordingly, for all these reasons, the trial court erred in denying the Whiteheads' motion for summary judgment.

---

[32] *See Herron*, 248 Ga. App. at 197 (2) ("[The homeowner] was not supervising the child at the time of the incident and was not otherwise negligent in a manner that contributed to the child's death. The child's mother, who was supervising the child at the time of the incident, was negligent in failing to do so. [The homeowner] cannot be held responsible for the death of the child under these facts. To hold otherwise would be to make him strictly liable for injuries to the child which resulted from a failure of the child's mother to properly supervise her.").

[33] *See Wren v. Harrison*, 165 Ga. App. 847, 849 (303 SE2d 67) (1983) ("[The child] was on the dock under the supervision of his parents at the time he drowned, and they were familiar with its construction and their son's limitations. [Because] the duty of providing a safe playground for a child rests upon his parents, any breach of that duty must be imputed to [the parents], rather than [the property owner].").

[34] *Herron*, 248 Ga. App. at 197 (2); *see Savannah, F. & W. Ry. Co. v. Beavers*, 113 Ga. 398 (39 SE 82) (1901) ("When a child wakes up in the morning in his father's house, the duty of providing a safe playground for him during the day rests upon his parents. In this duty shifted from the parent to private landowners because the child chances to escape from the parent's care?").

21

(c) Because we reverse the trial court's denial of summary judgment to the Whiteheads, we need not address their remaining enumerations of error as to the trial court's denial of their motion to strike the testimony of Green's expert witnesses.

2. *Case No. A22A0798.*

In addition to alleging the Whiteheads were liable for negligence, Green also named White Pools as a defendant, asserting that the company was negligent in its design, installation, or construction of the pool, resulting in reduced visibility of a person in distress. In doing so, she brought claims for negligent construction and design;[35] negligent instruction to the Whiteheads regarding pool safety;[36] strict

---

[35] As to this count, Count 1, the complaint alleged that "White[ ] Pools negligently designed and constructed the [p]ool. Specifically, the design of the [p]ool made it difficult or impossible to see drowning victims under the surface of the water. . . Defendant White[ ] Pools failed to exercise reasonable care when designing the [p]ool."

[36] As to this count, Count 5, the complaint alleged that White Pools "voluntarily undertook to teach the Whitehead[s] . . . about swimming pool safety" and, in doing so, "had a duty to exercise reasonable care when providing that instruction to the Whiteheads" but failed to do so. Specifically, White Pools did not "provide information to the Whitehead[s] . . . about the steps pool owners must take to keep children safe during pool parties," "about the dangers associated with the surface-disturbing features of the pool and the color of the interior warning."

liability for defective design of the pool;[37] strict liability for a failure to warn of the pool's unique features;[38] and strict liability for a manufacturing defect with regard to the pebble color used on the pool's interior.[39] Once again, the trial court denied White Pools's motion for summary judgment and motion to strike the testimony from Green's expert witnesses, giving rise to this interlocutory appeal.

(a) *Failure to Prove Causation.* White Pools contends the trial court erred in granting its motion for summary judgment on Green's claims for negligent construction and design (Count 1),[40] strict liability–failure to warn (Count 3),[41] strict

---

[37] As to this count, Count 2, the complaint alleged that White Pools "designed and manufactured" the pool, which was "defective" because "[t]he risks inherent in the design . . . outweighed any benefit derived by the design" and "alternative designs were feasible and could have been implemented . . ."

[38] As to this count, Count 3, the complaint alleged that White Pools "did not provide any warning that the design of the [p]ool made it difficult or impossible to see drowning victims under the surface of the water."

[39] As to this count, Count 4, the complaint alleged that White Pools "manufactures" the pebble coating used for the interior of the Whiteheads' pool and that it was "not merchantable and reasonably suited for its intended use when" it was sold to the Whiteheads" and, thus, was "defective."

[40] *See supra* note 35.

[41] *See supra* note 38.

liability–design defect (the pool itself) (Count 2),[42] and strict liability–manufacturing defect (the pebble color) (Count 4),[43] because she failed to establish causation. As to each of these claims, we agree.

(i) *Negligent Construction and Design; Design Defect; Manufacturing Defect.* As to strict liability, under OCGA § 51-1-11 (b) (1),

> [t]he manufacturer of any personal property sold as new property directly or through a dealer or any other person shall be liable in tort, irrespective of privity, to any natural person who may use consume, or reasonably be affected by the property and who suffers injury to his person or property because the property when sold by the manufacturer was not merchantable and reasonably suited to the use intended, and its condition when sold is the proximate cause of the injury sustained.[44]

And to state a claim for strict liability, the plaintiff must show that "(1) the defendant was the manufacturer of the product; (2) the product, when sold, was not merchantable and reasonably suited to the use intended[;] and (3) the product's

---

[42] *See supra* note 37.

[43] *See supra* note 39.

[44] Our Supreme Court has explained that "the phrase 'not merchantable and reasonably suited to the use intended,' as used in [OCGA § 51-1-11 (b) (1)], means that the manufacturer's product when sold by the manufacturer was defective." *Maynard v. Snapchat, Inc.*, 313 Ga. 533, 536 (2) (870 SE2d 739) (2022) (punctuation omitted).

defective condition proximately caused plaintiffs injury."[45] Importantly, there are three general categories of product defects: "manufacturing defects, design defects, and marketing/packaging defects."[46] Here, of course, Green made arguments regarding a design defect (as to the pool itself) and a manufacturing defect (as to the interior pebble coating).

In design-defect cases, our Supreme Court has concluded the best approach is the risk-utility analysis, in which there is a "balancing [of] the risks inherent in a product design against the utility of the product so designed."[47] So, the appropriate analysis "does not depend on the use of the product, as that may be narrowly or broadly defined, but rather includes the consideration of whether the defendant failed to adopt a reasonable alternative design which would have reduced the foreseeable risks of harm presented by the product."[48]

---

[45] *Brazil v. Janssen Rsch. & Dev. LLC*, 196 FSupp3d 1351, 1357 (II) (B) (N.D. Ga. 2016).

[46] *Banks v. ICI Americas, Inc.*, 264 Ga. 732, 733 (1) (450 SE2d 671) (1994).

[47] *Id.* at 735 (1).

[48] *Jones v. NordicTrack, Inc.*, 274 Ga. 115, 118 (550 SE2d 101) (2001) (footnote omitted); *see Woods v. A.R.E. Accessories, LLC*, 345 Ga. App. 887, 890 (815 SE2d 205) (2018) ("The 'heart' of a design defect case under the risk-utility analysis is the reasonableness of selecting from among alternative product designs

25

Importantly, because a manufacturer "may owe a design duty under Georgia's product-liability statute or under this State's decisional law, a plaintiff injured by a defectively designed product can pursue a claim against a manufacturer under either a statutory strict-liability theory or a decisional-law negligence theory or both."[49] And to prevail in a Georgia products liability action, whether based on negligence or strict liability, a plaintiff must show that "the proximate cause of the injury was a defect which existed when the product was sold."[50] A proximate cause is that which, "in the

and adopting the safest feasible one. Thus, the risk-utility analysis includes the consideration of whether the defendant failed to adopt a reasonable alternative design which would have reduced the foreseeable risks of harm presented by the product. Liability for defective design attaches only when the plaintiff proves that the seller failed to adopt a reasonable, safer design that would have reduced the foreseeable risks of harm presented by the product." (citations & punctuation omitted)).

[49] *Maynard*, 313 Ga. at 537 (2); *see id.* at 538 (2) (noting that "[b]ecause 'negligence principles' underlying the risk-utility analysis are used to determine breach of a manufacturer's statutory and decisional-law duties in many design-defect cases, we have noted that there is often significant 'overlap' between strict-liability and decisional-law negligence claims premised on design defects").

[50] *Carmical v. Bell Helicopter Textron, Inc., a Subsidiary of Textron, Inc.*, 117 F3d 490, 494 (II) (11th Cir. 1997); *see Maynard*, 313 Ga. at 538 (2) ("In addition to proving that a product was defectively designed, a plaintiff seeking to hold a manufacturer liable for a design defect must show that the defect proximately caused the plaintiff's injury."); *Talley v. City Tank Corp.*, 158 Ga. App. 130, 134 (3) (279 SE2d 264) (1981) ("Whether proceeding under a strict liability or a negligence theory, 'proximate cause' is a necessary element of [a plaintiff's] case."); *Silverstein v. Procter & Gamble Mfg. Co.*, 700 FSupp2d 1312, 1315 (II) (S.D. Ga. 2009)

26

natural and continuous sequence, unbroken by other causes, produces an event, and without which the event would not have occurred."[51]

As to a manufacturing defect, it is one in which "there was [a] flaw from the manufacturing process[,] not in the design or specifications of the product."[52] And here, no expert testified that the pebbles in question were flawed—much less that they were flawed due to an issue in the manufacturing process. But even if we assumed Green presented such testimony, she would still need to establish that the manufacturing defect proximately caused Tamira's injuries.[53]

---

("[T]here can be no recovery [under Georgia law] unless the manufacturer's product can be shown to be the proximate cause of the alleged injuries.").

[51] *Maynard*, 313 Ga. at 538 (2) (punctuation omitted); *accord Johnson v. Avis Rent A Car Sys., LLC*, 311 Ga. 588, 592 (858 SE2d 23) (2021).

[52] *Brazil*, 196 F. Supp3d at 1358 (II) (B) (1); *see Fletcher v. Water Applications Distrib. Grp., Inc.*, 333 Ga. App. 693, 697 (1) (a) (773 SE2d 859) (2015) ("Generally, a manufacturing defect results from an error specifically in the fabrication process, as distinct from an error in the design process."), *aff'd in part, rev'd in part sub nom. by Certainteed Corp. v. Fletcher*, 300 Ga. 327 (794 SE2d 641) (2016).

[53] *See Owens v. Gen. Motors Corp.*, 272 Ga. App. 842, 846-47 (2) (b) (613 SE2d 651) (2005) ("The second requirement to establish a factual issue in a strict liability claim is that the defect must be the proximate cause of the injury.").

On these questions, Green presented the testimony of two expert witnesses,[54] Dr. Gerald Dworkin and Dr. Thomas Griffiths. And as to White Pools's inclusion of the complained-of features in the Whiteheads' pool (*i.e.*, the tanning shelf, water features, and dark interior pebble color), Dworkin opined that if the pool had a lighter interior, "it would have been easier to observe Tamira while she was submerged below the surface of the pool" and "the probability of seeing Tamira submerged would have been greater than with a dark colored bottom." But he agreed that, in contrast with commercial pools, there was no requirement that residential pools be built with a light interior color. He also could not say with a reasonable degree of certainty how much more likely it would have been for Tamira to be observed earlier with a lighter color interior because "it was a combination of surface agitation from the features, surface agitation from the people that were in the water, compounded with shadows, compounded with the dark colored bottom, all of which contributed to the inability to observe [Tamira] because of the lack of supervision that was

---

[54] In reaching our conclusion that Green failed to establish causation on her claims against White Pools, we pretermit White Pools's assertion that the trial court separately erred in denying its motion to strike the experts' testimony due to lack of qualifications and reliability. We likewise pretermit White Pools's other assertions that the pool was not a "product" subject to products liability and that it is not a "manufacturer" of the interior pebble color. Accordingly, we do not address these alternative enumerations of error.

provided by the Whiteheads." As to the water features in the pool, he opined that if those features had been turned off, "the opportunity to observe" Tamira "would have been greater."

In addition to the features of the pool, Dworkin also testified that the people who *were* standing around the pool were distracted by their phones and conversations, which was also a contributing factor to the failure to notice Tamira in a timely manner. Ultimately, it was Dworkin's opinion that because of these factors, it was "critical to . . . either prevent [Tamira] from going in the pool or if you are going to allow her to go in the pool, there needs to be certain safeguards put in place," such as wearing a life jacket, having an adult within arm's reach, having a lifeguard, or designating a water watcher. He opined that, "had those requirements been there, Tamira would not have drowned." And the "biggest contributor was the lack of dedicated supervision of people in the water." Finally, he agreed the Bonds had a shared responsibility in Tamira's death and that an adult who brings a child to a commercial or residential swimming pool has "the ultimate responsibility of looking after that child and the safety of that child[.]

As for Dr. Griffiths's opinion regarding the pool and its features, he opined that the tanning shelf, dark-colored interior, and surface agitation created by the water

features constituted "hidden hazards" within the Whiteheads' pool. He agreed the features were open and obvious, but the hidden hazard was that those features could create a situation in which "a person who is on the bottom of the pool can be basically made to disappear from view." It was his view that "the disturbance on the water and the dark-colored bottom of the [Whiteheads's] pool prevented the partygoers from seeing Tamira's body[,]" though he conceded it was also possible these features may not have contributed at all.

While Griffiths agreed that, "had the bottom of the pool been lightly colored and there had been no water features adding to the ripple effect of the surface," Tamira's body would have been visible to people in and around the pool, he qualified that response to specify that "it would have been easier if . . . some adults there were designated as pool watchers and were given the job to stand at the pool side and watch the people in the pool." And he could not testify regarding the extent to which the rippling effect in the Whiteheads' pool was caused by their water features as opposed to the movements made by other people in the pool when Tamira drowned. Nor could Griffiths testify how much more quickly Tamira would have been discovered if the water features had been turned off or if a lighter pebble color had been used for the pool interior. Nevertheless, he opined that it "would have been more

likely" if the pool "had a light-colored bottom and if there were no water features . . . operating at the time of the . . . pool party, one of the many people in and around the pool would have discovered Tamira's body within the first six minutes after she had gone underwater for the final time."

It was Griffiths's "educated guess" that ripples in the water were "probably . . . the most significant blinding factor . . . " because "when someone is perfectly still and you have ripples on the surface, refraction makes it look like a person really is moving." But again, Griffiths acknowledged that a number of factors beyond water features create ripples, including other people in the pool, objects in the pool, splashing in the pool, and the type of gutters used on a pool (of which the Whiteheads had a type that allowed for more ripples). Finally, like Dworkin, Griffiths agreed the primary responsibility for a child in and around a pool is with the person who brings the child to the pool, particularly when that person knows the child cannot swim.

So, although there was testimony that the dark interior pebble color and water features contributed to an inability to see Tamira's body submerged in the Whiteheads' pool, the testimony that Tamira would have been noticed in the absence of those features was entirely speculative because there was no testimony anyone actually attempted to look for Tamira but never saw her submerged in the pool.

31

Indeed, the experts repeatedly opined that White Pools should have warned the Whiteheads about the features and instructed them to employ a lifeguard for pool parties or designate an official "water watcher" who would be free from other distractions. Here, the opinion that Tamira would "more likely" have been discovered earlier in the absence of the pool's water features and dark interior pebble color was dependent upon the speculation that somebody would have been *looking* for Tamira.[55] And when a party is relying on inferences to prove a point, "not only must those inferences tend in some proximate degree to establish the conclusion sought, but must also render less probable all inconsistent conclusions."[56] This, the evidence does not do.

---

[55] *Ogletree v. Navistar Int'l Transp. Corp.*, 245 Ga. App. 1, 7 (1) (535 SE2d 545) (2000) ("In this case, the inference that someone might have kept a factory-installed back-up alarm does not tend to prove that [the driver] would have kept it under these circumstances, nor does it render less probable the inconsistent inference that [the driver] would have discarded the alarm because he did not want it and was not required to keep it. Thus, the jury could not find that but for [the defendant's] failure to install an alarm, [the decedent's] death would have been prevented because there was no competent evidence supporting a reasonable inference that the alarm would have been present and operational on the day of the accident.").

[56] *Page v. Atlanta Ctr. Ltd.*, 219 Ga. App. 422, 424 (465 SE2d 456) (1995).

In addition to the foregoing testimony, Griffiths testified there can be a failure to recognize a drowning victim due to "intrusions and distractions of secondary duties, which is a perfect fit for a pool party." These distractions can include eating, speaking with other people, playing with friends, talking on the phone, texting, or anything else that pulls the person's attention away from the water. All of those things, according to Griffiths, can create external distractions that can cause a person to not see a drowning victim submerged in the water or at the surface. Furthermore, "internal noise," or a person's inner thoughts, can also create a distraction that causes a person not to notice a drowning victim even when looking directly at the water. Lastly, Griffiths described "cognitive body blindness," in which a person will actually see a drowning victim but does not believe what they are seeing.

Ultimately, Griffiths testified that people being distracted by their own thoughts and activities, and the angle of the sun at the time in question, were *all* variables that contributed to Tamira being under the water "for some time and not being found," but there was "no way" to know the percentage or extent to which those variables contributed to the delayed discovery. Nor could he differentiate between the many different variables that caused rippling in the pool. And because of these different variables, it was Griffiths's opinion that White Pools should have

33

told the Whiteheads to hire a lifeguard if they intended to host pool parties or, in the alternative, to outfit all non-swimmers in life jackets.

Here, it is undisputed there was no lifeguard or designated "water watcher" at the party, nor is there any evidence Bernard ever attempted to lay eyes on Tamira in the 13 minutes before her body was discovered. Additionally, Rolinda testified that when she spotted Jaida inside without Tamira, she began to look for her granddaughter, but she did not testify to ever searching for Tamira in the pool and failing to spot her. Rolinda's testimony instead was that she remembered "running to look for Tamira, calling her," and that someone said to "check the bouncy house." As a result, Rolinda checked the bouncy house and a basketball court before seeing Tamira's body being carried from the pool. Accordingly, the suggestion that Tamira would have been discovered soon enough to save her life in the absence of the relevant features is entirely speculative because there is no indication the people who were most responsible for her well being—even according to the expert testimony—looked for her within the pool area during the time she was underwater.[57]

---

[57] *See Sugarloaf Café, Inc. v. Willbanks*, 279 Ga. 255, 256 (612 SE2d 279) (2005) ("This expert opinion evidence cannot be used to contradict the direct evidence showing that [the inebriated driver] did not drive to or from [the restaurant] because it is based only on inferences and does not establish the conclusion that [the restaurant] knew [the driver] would be driving soon after she left."); *see also Cowart*

34

Furthermore, neither Dworkin nor Griffiths believed White Pools acted unreasonably in terms of building and designing the pool with the options picked by the Whiteheads.[58] To the contrary, Dworkin testified that his opinion was *not* that White Pools should not have designed or built a pool containing the elements and features present in the Whiteheads' pool, but rather that White Pools should have warned the Whiteheads about the pool's features and the proper safety protocols to follow when hosting a pool party. And Griffiths testified that the interior color of the Whiteheads' pool was "relatively common." Additionally, he was aware of no warnings or prohibitions against the use of the pebble color on the interior of the Whiteheads' pool,[59] the use of three or more water features, or the use of a tanning

---

*v. Widener*, 287 Ga. 622, 633 (3) (c) (697 SE2d 779) (2010) (explaining that summary judgment cannot be avoided based on speculation or conjecture); *Ireland v. Williams*, 351 Ga. App. 124, 131 (1) (830 SE2d 538) (2019) (physical precedent only) ("[A] jury would not be authorized to infer negligence because an inference cannot be based on evidence which is too uncertain or speculative or which raises merely a conjecture or possibility.").

[58] *Cf. Ford Motor Co. v. Stubblefield*, 171 Ga. App. 331, 333 (319 SE2d 470) (1984) (affirming jury verdict in favor of defendant manufacturer in a wrongful-death action when the case involved multiple experts who testified that car manufacturer acted unreasonably in its decision-making process and design).

[59] Griffiths testified that residential pools have "very few requirements" and "very few codes," and thus no standard *requires* residential pools to have light-colored floors, although commercial pools are required to do so.

shelf. Griffiths also affirmatively testified that he had no conclusions or opinions about the "design, construction[,] or installations" within the pool. So, because Green's experts provided no testimony suggesting that any potential negligent construction or design defect was the proximate cause of Tamira's death, and any testimony they provided that the pool's design or features contributed to her death was mere speculation, the trial court erred in failing to grant summary judgment on these claims as well.

(ii) *Failure to Warn*. White Pools further contends the trial court erred in denying its motion for summary judgment as to Green's claim for failure to warn the Whiteheads about the pool's features because, again, she failed to establish that the failure to warn proximately caused Tamira's injuries. Again, we agree.

In failure-to-warn cases, the duty to warn arises "whenever the manufacturer knows or reasonably should know of the danger arising from the use of its product."[60]

---

[60] *Chrysler Corp. v. Batten*, 264 Ga. 723, 724 (1) (450 SE2d 208) (1994); *see Woods v. A.R.E. Accessories, LLC*, 345 Ga. App. 887, 889 (815 SE2d 205) (2018) ("[A] manufacturer which (before or after the sale of its product) knows or reasonably should know of a danger arising from use of the product has a duty to give warning of such danger." (punctuation omitted)).

Nevertheless, proximate causation is "a necessary element of a failure to warn claim."[61]

In this case, Griffiths testified that White Pools was "obligated to inform the customer about [the] hazards and the risks and what can be done to mitigate those hazards and risks especially when you have young children, non[-]swimmers, and especially when you have a pool party." But importantly, Griffiths did not believe White Pools acted unreasonably in installing the various features in the Whiteheads' pool, but rather that White Pools should have warned the Whiteheads about the "potential safety consequences of having those features" *in addition to* "the conventional hazards and risks we know of using a swimming pool."

Nevertheless, Green again cannot establish that White Pools's alleged failure to warn the Whiteheads—whether based upon negligence or strict liability[62]—proximately caused Tamira's injuries. Even if White Pools informed the

---

[61] *Davis v. John Crane, Inc.*, 353 Ga. App. 243, 251 (2) (b) (836 SE2d 577) (2019); *see Wilson Foods Corp. v. Turner*, 218 Ga. App. 74, 75 (1) (460 SE2d 532) (1995) ("When such suits are grounded on either a strict liability or negligence theory, proximate cause is a necessary element of the plaintiff's case.").

[62] *See Chrysler Corp.* 264 Ga. at 724 (1) ("[T]he manufacturer of a product which, to its actual or constructive knowledge, involves danger to users, has a duty to give warning of such danger." (punctuation omitted)); *see also* OCGA § 51-1-11 (c) ("Nothing contained in this subsection shall relieve a manufacturer from the duty

Whiteheads about heightened risks and that "the [pool] industry advoc[ates] for the use of life jackets, for the need for a water watcher or lifeguard, [and] for . . . staying within arm's reach of children," Dworkin could not say within a reasonable degree of certainty what steps the Whiteheads would have taken and, thus, whether it would have prevented Tamira's death. Griffiths, too, definitively testified that he could not conclusively say White Pools providing a warning to the Whiteheads about the potential consequences of the pool's interior color and water features would have prevented Tamira's drowning because he did not "know if the pool owners are going to actually listen to and/or follow the[ ] recommendations." Instead, he could only say they "may have helped."

Even more importantly, the Whiteheads could not say what, if anything, they would have done differently if they had received such warnings.[63] In fact, Tahir Whitehead testified that even if he had received warnings about the potential for

to warn of a danger arising from use of a product once that danger becomes known to the manufacturer.").

[63] *Cf. Bagnell v. Ford Motor Co.*, 297 Ga. App. 835, 838 (2) (678 SE2d 489) (2009) (explaining that under Texas law, "a failure-to-warn claimant proves causation by showing that adequate warnings would have made a difference in the outcome, that is, that they would have been followed," and that "the necessary proof may consist of little more than a driver's 'self-serving assertion' that he or she would have been mindful of an adequate warning had it been given" (punctuation omitted)).

38

water features to make it more difficult to see a drowning child, he still would have purchased the water features, and he could not say whether he would have purchased the dark pebble interior if he had been warned about its potential to decrease visibility. Nor could he definitively say if he would have turned off the water features for the pool party if he had known there were increased risks. There is, then, no evidence to support a reasonable inference that any warning to the Whiteheads from White Pools would have prevented Tamira's injuries and death.[64]

In light of the foregoing, Green failed to establish that the pool's features or the failure to warn the Whiteheads about those features proximately caused Tamira's injuries and, accordingly, the trial court erred in denying White Pools's motion for summary judgment.

---

[64] *See Key Safety Sys., Inc. v. Bruner*, 334 Ga. App. 717, 718 (1) (780 SE2d 389) (2015) (affirming denial of summary judgment to defendant when plaintiff "testified that in the event of a rollover, he 'expected the seat belts to keep you in the seat' and if he had known that there was a chance of ejection, he would not have purchased the vehicle"); *Ga. Cas. & Sur. Co. v. Salter's Indus. Serv., Inc.*, 318 Ga. App. 620, 626 (4) (734 SE2d 415) (2012) ("A breach of a duty to warn, however, must also be the cause of the injury about which the plaintiff complains, and the plaintiff must present evidence supporting a reasonable inference that the warning provided by the defendant would prevent the injury.").

(b) *Negligence: Voluntary Undertaking*. We likewise reject the contention that there is a genuine issue of material fact as to whether White Pools "voluntarily assumed" a duty to warn the Whiteheads of general pool safety protocols, under Restatement (Second) of Torts §324A, when it provided certain instructions to the Whiteheads during "Pool School."

A thorough description of this principle of law appears in Division 1 (b), *supra*, but the record evidence shows White Pools provided verbal and written instructions to the Whiteheads regarding pool maintenance and safety of the pool's water and *equipment*. But there is no evidence White Pools ever undertook to educate the Whiteheads about *general* pool safety, *i.e.*, how to safely host parties or protect guests from drowning. And under Georgia law, Restatement (Second) of Torts §324A "will not support a cause of action based on the theory that a party who did not undertake

40

to render services should have done so."[65] Thus, the trial court erred in denying White Pools's motion for summary judgment on this ground as well.

(c) We need not address any of White Pools's remaining enumerations of error because the trial court erred in denying its motion for summary judgment as to each count of Green's complaint.

For all these reasons, we reverse the trial court's ruling in both Case Number A22A0797 and Case Number A22A0798.

*Judgments reversed. Mercier and Markle, JJ., concur.*

---

[65] *Bing v. Zurich Servs. Corp.*, 332 Ga. App. 171, 173 (1) (770 SE2d 14) (2015) (punctuation & emphasis omitted); *Garvin v. Atlanta Gas Light Co.*, 334 Ga. App. 450, 455 (1) (b) (779 SE2d 687) (2015) ("The duty assumed under Section 324A applies only to an undertaking, and it will not support a cause of action based on the theory that a party who did not undertake to render services should have done so." (emphasis omitted)).